ESTADO LIBRE ASOCIADO DE PUERTO RICO, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE PONCE, HON. ANTONIO J. MATTA, JUEZ, demandado; PEDRO ÁNGEL TORRES, interventor.

*Número:* C-65-39        *Resuelto:* 14 de junio de 1967

718

*J. B. Fernández Badillo, Procurador General,* y *Peter Ortiz, Procurador General Auxiliar,* abogados del peticionario; *Enrique Corchado Juarbe,* abogado del interventor.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

En una acción sobre nulidad de confiscación de un vehículo de motor interpuesta por Pedro Ángel Torres contra el Estado Libre Asociado de Puerto Rico, el Tribunal Superior formuló las siguientes conclusiones de hecho:

"2.) El demandante para el 24 de septiembre de 1963 y desde antes, era dueño de un vehículo de motor marca GMC Panel Delivery, licencia C336-371 que fue confiscado en dicha fecha porque el 22 de ese mes fue usado para cargar, transportar, llevar y trasladar material del juego ilegal de la Bolita.

"3.) El vehículo a que se ha hecho referencia ha venido siendo usado desde el 1961 por Nicolás Ortiz por contrato de arrendamiento con el demandante con un canon de $40.00 semanales. Ortiz es dueño de un negocio de panadería en Coamo desde 1958 y ha usado el vehículo para vender y repartir el pan. De acuerdo con los términos del contrato, Ortiz venía obligado a suministrar y pagar el chofer para el vehículo y tenía supervisión completa del mismo. El gasto por gomas, consumo de gasolina y reparaciones era por cuenta de Ortiz.

"4.) Ortiz tiene su panadería en la Calle Dr. Veve #9 de Coamo. Para septiembre de 1963 el conductor del vehículo arrendado lo era Federico Rodríguez Zayas a quien pagaba un

centavo por cada libra de pan vendida. Rodríguez a su vez vendía el pan de Ortiz en los pueblos de Villalba y Orocovis y sus barrios. El negocio entre Rodríguez y Ortiz comenzó en el 1958. Cuando Rodríguez no podía venir, otra persona enviada por él conducía la guagua. Era la costumbre cargar la guagua y llevársela por la noche para la casa de Rodríguez para facilitar la venta temprano al día siguiente. El 22 de septiembre de 1963 la guagua salió conducida por Rodríguez para vender pan en Orocovis y Villalba.

"5.) En la tarde del 22 de septiembre, miembros de la policía iban en el carro particular del agente Carlos J. Torres, de Villalba para el sitio Los Pinos. Vieron la guagua C336-371 estacionada casi en el centro de la carretera. Los agentes, entre ellos el policía José Ríos, conocían a Rodríguez y sabían se dedicaba a la venta de pan. Al ver el vehículo se detuvieron detrás del mismo y fueron a ver qué ocurría. Rodríguez al ver a Ríos lo reconoció y continuó la marcha tirando unos papeles al suelo que al ser recogidos por la policía resultaron ser una lista de números del juego de Bolita.

"6.) El demandante arrendó su guagua a Ortiz para dedicarla al negocio de venta de pan exclusivamente. Ortiz por su parte permitía que Rodríguez la usara en la venta de pan y le tenía prohibido usarla para otros fines. Nunca tuvo conocimiento o información de que Rodríguez se dedicara, además, al juego de Bolita o que usara el vehículo para ello."

.     .     .     .     .     .     .     .

"A la luz de estos hechos"—concluyó el tribunal sentenciador—"se puede razonablemente inferir que el caso cae bajo la excepción reconocida que protege el derecho de un tercero inocente. Ochoteco v. Tribunal Superior, C-63-1, resuelto en 5 de junio de 1963." En su consecuencia dicho tribunal dictó sentencia declarando con lugar la demanda y ordenando la devolución del vehículo confiscado o en su defecto a pagar al demandante su valor de $1,800.00.

Expedimos un auto de *certiorari* para revisar la referida sentencia.

■ El criterio de la mayoría de este Tribunal es al efecto de que la norma que aún prevalece en cuanto a la procedencia de confiscaciones en que hay envueltos derechos de terceros es la que se enunció en el caso de *General Motors Acceptance* v. *Brañuela*, 61 D.P.R. 725 (1943). Así quedó establecido en la opinión separada del Juez Asociado Sr. Blanco Lugo en el caso de *Meléndez* v. *Tribunal Superior*, 90 D.P.R. 656, 677 (1964). De suerte que en esta jurisdicción prevalece la doctrina de que el procedimiento de confiscación va dirigido contra el vehículo mismo y no contra sus dueños y que por consiguiente los derechos que sobre el vehículo puedan tener terceros inocentes no están protegidos, excepto en aquellos casos en que se demuestre que la posesión del vehículo ha sido obtenida por el infractor sin el consentimiento expreso implícito del dueño o del tercero inocente, como sucede cuando el vehículo ha sido hurtado, y si el dueño o tercero interesado directa o indirectamente ha puesto el vehículo en posesión del infractor o de la persona bajo la cual ésta actúa, los derechos del dueño o tercero interesados en tales circunstancias corren la suerte del uso a que el poseedor pueda someter el vehículo.

■ Recientemente se resolvió en el caso de *Plymouth Sedan* v. *Pennsylvania*, 380 U.S. 693 (1965) que como el propósito del procedimiento de confiscación es castigar por la comisión de un delito público, dicho procedimiento tiene carácter punitivo y es de naturaleza cuasi criminal y por consiguiente que evidencia obtenida en violación de garantías constitucionales no es admisible en dicho procedimiento, para establecer la comisión del delito que da margen a la infracción. Sin embargo, en dicho caso no se discute la regla sobre el derecho de terceros inocentes. Si pretendemos asimilar criterios de intención criminal cuando se trata de terceros concederíamos una inmunidad franca a los ofensores de la ley que a través de una hábil estratagema estarían en condiciones de violarla empleando vehículos ajenos sin el riesgo de la con-

fiscación. Además, ello conduciría a la posición insostenible de que sería absoluta la inmunidad del tercero (dueño del vehículo) si dentro del procedimiento de confiscación hubiera que establecerse su responsabilidad criminal en un delito público cometido por otra persona.

■ El tribunal de instancia se equivocó al aplicar a este caso lo resuelto en *Ochoteco*, supra. El caso de *Ochoteco*, caía dentro de la excepción que señalamos en *Brañuela* ya que los hechos estipulados en el mismo permitían la conclusión de que el infractor había cometido un delito de hurto de uso. La situación de hechos es distinta aquí. El infractor Rodríguez era un agente o empleado del arrendatario del vehículo confiscado. Cometió los actos delictivos mientras conducía el vehículo para vender pan en Orocovis y Villalba. El lugar donde cometió el delito estaba en su ruta. La posesión del vehículo por Rodríguez estaba en ese momento autorizada por el arrendatario del mismo. No hay base para concluir que Rodríguez había cometido el delito de hurto de uso del vehículo en el momento de infringir la Ley de la Bolita. Tampoco protege al tercero el hecho de que Ortiz hubiera prohibido a Rodríguez usar el vehículo para otros fines ni el hecho de que ignorara que Rodríguez usaba el vehículo en relación con el juego prohibido de la Bolita [1] ya que el uso no autorizado de un vehículo por un empleado no protege al dueño del vehículo. *Metro Taxicabs* v. *Tesorero*, 73 D.P.R. 171 (1952).

Arguye el interventor que los hechos de este caso dan margen a resolver que Rodríguez cometió el delito de abuso de confianza estatuido en el Art. 450 del Código Penal (33 L.P.R.A. sec. 1726).

■ No tiene razón aun cuando la comisión de tal delito constituyera otra excepción a la regla de *Brañuela*. En su

---

[1] No se suscita en este caso la cuestión de si el vehículo fue ocupado mientras se usaba en relación con el juego de la bolita. Todo indica que su conductor lo usaba también para vender números de la bolita.

versión castellana dicho artículo dispone: "Todo dependiente, agente o sirviente de alguna persona, que fraudulentamente empleare en su propia utilidad, u ocultare con fraudulenta intención de apropiárselos, cualesquiera bienes confiados a su custodia en virtud de su empleo como tal dependiente, agente o sirviente, será culpable de abuso de confianza."

Ateniéndose al anterior lenguaje sostiene el interventor que Rodríguez empleó en su propia utilidad el vehículo al transportar en el mismo, lista de números del juego de la bolita, sin la autorización ni conocimiento del interventor, por lo que Rodríguez incurrió en el delito de abuso de confianza y que ello establece una excepción a la regla de *Brañuela*. El texto inglés de dicho artículo, que es el que debe prevalecer, ([2]) da una idea más clara del significado de la frase "que fraudulentamente empleare en su propia utilidad". En inglés la frase usada es *"who fraudulently appropriates to his own use"*. ([3]) Esto quiere decir que el dependiente, agente o sirviente, debe fraudulentamente apropiarse en su propia utilidad de los bienes confiados a su custodia en virtud de su empleo como tal dependiente, agente o sirviente para que incurra en el delito de abuso de confianza. Es decir, lo que realmente constituye este delito es que haya una conversión de la propiedad en virtud de la cual el dependiente, agente o sirviente la haga suya. Véanse, *Blanco v. Pueblo*, 25 D.P.R. 720 (1917); *Pueblo v. Calderón*, 18 D.P.R. 584 (1912).

En este caso Rodríguez no se apropió en su propia utilidad del vehículo confiscado. No puede sostenerse por tanto,

---

([2])*Pueblo v. Palóu*, 80 D.P.R. 364, 369 (1958); *Pueblo v. Belardo*, 50 D.P.R. 512 (1936); *Pueblo v. Pelliccia*, 53 D.P.R. 591 (1938).

([3])El texto completo de dicho artículo en inglés lee como sigue:

*"Every clerk, agent, or servant of any person who fraudulently appropriates to his own use, or secretes with a fraudulent intent to appropriate to his own use, any property of another which has come into his control or care by virtue of his employment as such clerk, agent, or servant is guilty of embezzlement."* (33 L.P.R.A. sec. 1726.)

que cometiera el delito de abuso de confianza prescrito en el Art. 450 del Código Penal.

*Se revocará la sentencia dictada por el Tribunal Superior y se dictará otra declarando sin lugar la demanda.*

El Juez Presidente Señor Negrón Fernández no intervino. Los Jueces Asociados Señores Belaval, Hernández Matos y Santana Becerra disintieron en votos separados.

—O—

Voto disidente del Juez Asociado Sr. Santana Becerra en el cual concurre el Juez Asociado Señor Belaval.

San Juan, Puerto Rico, 14 de junio de 1967

Después de la decisión del Tribunal Supremo de los Estados Unidos de 29 de abril de 1965. *One Plymouth Sedan* v. *Pennsylvania,* 380 U.S. 693, 696–702, no creo que puedan seguir prevaleciendo aquí aquellos criterios que consideraron la naturaleza de la confiscación como un procedimiento meramente civil dirigido a una cosa. El caso citado afirma claramente la naturaleza criminal de la confiscación y que impone castigo por la comisión de delito. En consecuencia es imperativo que estos casos se resuelvan tomando en cuenta las garantías básicas constitucionales y de ley que protegen al ciudadano acusado en procedimientos criminales.

La Ley Núm. 220 de 1948 autoriza la confiscación de vehículos "utilizados en relación con los juegos prohibidos" . . . "que hayan sido ocupados en relación con dichos juegos". La evidencia en el caso no prueba, en aquel grado de suficiencia legal que demanda el debido procedimiento de ley y un fallo justo en procedimientos criminales que imponen castigos por la comisión de delito, que el vehículo en este caso tuviera esa utilización u ocupación, dentro de la interpretación y significado que a estas frases debe darse compatible con la protec-

ción de un inocente contra castigo. Se probó más bien una utilización lícita en el curso ordinario de los negocios, aun cuando ocurriera que un conductor llevara una lista del juego. Dentro de la situación normativa del presente, según reafirmada y consagrada en el citado caso de *Plymouth Sedan* por un Tribunal Supremo unánime, en las circunstancias de hecho de este caso se le impone castigo a un inocente. Por lo dicho no concurro en el criterio del Tribunal.

—O—

Opinión disidente emitida por el Juez Asociado Señor Belaval con la cual están conformes los Jueces Asociados Señores Hernández Matos y Santana Becerra.

San Juan, Puerto Rico, a 14 de junio de 1967

El 24 de septiembre de 1963, el interventor Pedro Ángel Torres, era dueño de un vehículo de motor marca GMC Panel Delivery, licencia C336-371; desde el 1961 dicho vehículo había sido arrendado por el interventor a Nicolás Ortiz para que lo usara en el negocio de panadería que desde el 1958 tenía dicho Nicolás Ortiz en la ciudad de Coamo. De acuerdo con los términos del contrato de arrendamiento, Ortiz se había comprometido a nombrar, pagar y supervisar al conductor del vehículo de motor, objeto del arrendamiento. Desde el 1958, o sea, desde que empezó su negocio de pan, el arrendatario Ortiz nombró como conductor del vehículo arrendado a Federico Rodríguez Zayas, a quien pagaba un centavo por cada libra de pan vendida en los pueblos de Villalba, Orocovis y sus barrios. Era costumbre cargar la guagua en el establecimiento de Ortiz, y asi cargada, llevársela por la noche a casa de Rodríguez para salir temprano a vender la mañana siguiente. Como de costumbre, el día 22 de septiembre de 1963, salió la guagua conducida por Rodríguez a vender pan en Orocovis y Villalba. Ciertos agentes de la policía vieron la

guagua estacionada en el centro de la carretera y se detuvieron detrás de la guagua a ver qué ocurría. Al ver la policía, el conductor Rodríguez continuó la marcha tirando un papel al suelo, que al ser recogido por la policía, resultó ser una lista de números del juego de bolita. Ni el dueño del vehículo Pedro Ángel Torres, ni el arrendatario del mismo vehículo Nicolás Ortiz tenían conocimiento que el conductor del vehículo Federico Rodríguez Zayas se dedicaba al juego de bolita; ni se le había autorizado para conducir en el vehículo dedicado al negocio de pan del arrendatario, material de bolita alguno. El vehículo del interventor Pedro Ángel Torres fue confiscado por el Estado Libre Asociado de Puerto Rico y solicitada la anulación de la diligencia de confiscación, la ilustrada Sala recurrida de Ponce, del Tribunal Superior de Puerto Rico, ordenó la devolución del vehículo por ser el dueño del vehículo parte inocente en el uso ilegal de dicho vehículo.

Expedido un auto de *certiorari* para revisar la referida resolución, la opinión de la mayoría de este Tribunal la revoca bajo el siguiente fundamento: "El criterio de la mayoría de este Tribunal es al efecto de que la norma que aún prevalece en cuanto a la procedencia de confiscaciones en que hay envueltos derechos de terceros es la que se enunció en el caso de *General Motors Acceptance* v. *Brañuela*, 61 D.P.R. 725 (1943). Así quedó establecido en la opinión separada del Juez Asociado Señor Blanco Lugo en el caso de *Meléndez* v. *Tribunal Superior*, 90 D.P.R. 656, 677 (1964). De suerte que en esta jurisdicción prevalece la doctrina de que el procedimiento de confiscación va dirigido contra el vehículo mismo y no contra sus dueños y que por consiguiente los derechos que sobre el vehículo puedan tener terceros inocentes no están protegidos, excepto en aquellos casos en que se demuestre que la posesión del vehículo ha sido obtenida por el infractor sin el consentimiento expreso o implícito del dueño o del tercero inocente, como sucede cuando el vehículo ha sido hurtado, y si el dueño o tercero interesado directa o indirectamente ha

puesto el vehículo en posesión del infractor o de la persona bajo la cual ésta actúa, los derechos del dueño o tercero interesados en tales circunstancias corren la suerte del uso a que el poseedor pueda someter el vehículo."

Veamos, otra vez, si resultan correctas las aseveraciones que sobre el caso de *Brañuela*, contiene la opinión de la mayoría: *General Motors Acceptance* v. *Brañuela*, 60 D.P.R. 696 (De Jesús) (1942), cita precisa a las págs. 698 a 701 y *General Motors Acceptance* v. *Brañuela* en reconsideración (De Jesús) (1943), cita precisa a las págs. 726–730.

En la primera decisión se destacaron los siguientes hechos: Caribe Motors Corporation vendió a Petra Brañuela bajo contrato de venta condicional cierto automóvil Chevrolet que luego fue confiscado por el Tesorero de Puerto Rico con motivo de haberlo utilizado el chofer Juan Reyes Matías en la transportación de treinta y cinco galones de alcohol en violación de la "Ley de Espíritus y Bebidas Alcohólicas", aprobada el 30 de junio de 1936 (3a. Leg. Ext. 45). La apelante (General Motors Acceptance), a quien Caribe Motors Corporation había cedido sus derechos en el contrato de venta condicional, presentó en la corte inferior contra Petra Brañuela y contra el Tesorero una solicitud de reposesión, en armonía con el procedimiento establecido por la Ley de Ventas Condicionales de Bienes Muebles y Semovientes. Alegó la celebración del contrato entre Caribe Motors Corporation y la demandada Brañuela; la cesión que de sus derechos como vendedora le hiciera la Caribe Motors Corporation; la confiscación del vehículo por el Tesorero; el incumplimiento del contrato por parte de la compradora al usar o permitir que se usara el vehículo para la transportación de licores en violación de la ley; y por último, que la compradora le adeudaba por concepto del precio la cantidad de $528.12. Terminó la petición con súplica de que se ordenase al márshal incautarse del automóvil y entregarle a la peticionaria, para que ésta procediese a disponer del mismo en armonía con la citada

ley de ventas condicionales de bienes muebles. El día señalado para la vista compareció el Tesorero, no así la codemandada Brañuela. El Tesorero admitió los hechos en la petición, pero alegó que el Art. 62 de la Ley de Bebidas Alcohólicas le confiere un derecho preferente sobre el citado automóvil, *alegando además que la petición no expone hechos constitutivos de causa de acción.*

Es bueno recordar cuáles fueron los hechos *alegados* en la petición, *aceptados* por el Tesorero de Puerto Rico sobre los cuales se basa la primera opinión del caso de Brañuela. Son los siguientes: (1) celebración de un contrato de venta condicional entre Caribe Motors Corporation y la demandada Brañuela; (2) cesión de la Caribe Motors Corporation de sus derechos como vendedora a la General Motors Acceptance; (3) la confiscación del vehículo por el Tesorero; (4) el incumplimiento del contrato por parte de la compradora al usar o permitir que se usara el vehículo para la transportación de licores en violación de la ley; y por último, que la compradora Brañuela, le adeudaba por concepto del precio la cantidad de $528.12.

Sigue la opinión: "Descansando como descansa principalmente la contención de la apelante en la interpretación que deba darse al citado artículo 62, está en orden transcribirlo aquí para la mejor inteligencia de la discusión: 'Art. 62. El Tesorero queda por la presente autorizado para confiscar cualquier vehículo, bote, lancha, o cualquier embarcación marítima o aérea que se capture cargado o en el momento de cargar o de estar transportando, llevando o trasladando espíritus destilados o bebidas alcohólicas fabricadas, importadas, destiladas o rectificadas ilegalmente y sobre los cuales no se hubieren pagado los impuestos prescritos por esta Ley; y los mismos serán vendidos en pública subasta para beneficio de El Pueblo de Puerto Rico; *Disponiéndose*, que el Tesorero, a su discreción, y si el servicio público así lo requiere, podrá designar no más de cinco (5) de dichos vehículos o botes de

motor para uso de los funcionarios y agentes debidamente autorizados por el Negociado de Bebidas Alcohólicas y Narcóticos.' El precepto transcrito es terminante en cuanto autoriza al Tesorero a confiscar cualquier vehículo, bote, etc., que se capture transportando espíritus destilados o bebidas alcohólicas sobre los cuales no se hubieren pagado los impuestos prescritos por la ley. Estatutos como el que nos ocupa han recibido distintas interpretaciones en lo que respecta a los derechos que sobre el vehículo tuvieren terceras personas que no hubieren tenido conocimiento ni consentido expresa o implícitamente en el uso ilegal de la propiedad. Tanto en su alegato como en su informe oral la apelante [General Motors Acceptance] parte de la base de que ella no tuvo conocimiento ni en forma alguna consintió en el uso ilegal del vehículo y pretende que interpretemos el artículo 62, supra, en el sentido de que sus disposiciones no le son aplicables, y por lo tanto sus derechos no pueden ser afectados por la infracción de ley cometida por la compradora condicional o su agente. No descansa sobre una base sólida la argumentación de la apelante, pues en ninguna forma consta de los autos que ella sea el tercero inocente a que se refiere la jurisprudencia por ella invocada. El mero hecho de que la apelante sea la cesionaria de los derechos de la vendedora condicional no implica necesariamente que no haya podido tener conocimiento con anterioridad a la infracción que dió lugar a la confiscación del vehículo, de que éste fuese usado para tales fines, ni tampoco impide que expresa o implícitamente consintiera a tal uso, no reposeyéndolo del infractor. [P] En el presente caso la apelante no nos ha puesto en condiciones de resolver la cuestión planteada en su alegato, pues no tenemos base para asumir que sea ella un tercero inocente, y a ella—que ahora lo afirma—incumbía alegarlo y probarlo. El procedimiento establecido por la apelante es de carácter civil y no existe presunción alguna de inocencia que pudiera justificar la omisión de que antes se ha hecho referencia . . . [P] . . . volviendo a las alega-

ciones de las partes, forzoso es convenir con la corte senten-
ciadora en que la petición no aduce hechos constitutivos de
causa de acción. La apelante, como ya hemos dicho, no expuso
en forma alguna hechos que pusieran a la corte inferior en
condiciones de determinar si en efecto el artículo 62, supra,
no le era aplicable. . . ."

Como se ve, lo que interesaba la apelante era una declara-
ción, en el sentido, que tan pronto se violara por el comprador
la prohibición del contrato de usar el vehículo para fines ile-
gales, ella adquiría contra el comprador el derecho de reposeer
el vehículo, y en cuanto al Art. 62 de la Ley de Espíritus y
Bebidas Alcohólicas del 1936, convertida quedaba en un ter-
cero inocente, independiente de cual hubiera sido su conducta
con relación al uso del vehículo y las actuaciones del com-
prador condicional. Lo que se le exigió fue que probara *no
tener conocimiento de ningún uso ilegal, ni haberlo en ninguna
forma consentido con anterioridad a la infracción que dio
lugar a la confiscación del vehículo.*

En a reconsideración—*General Motors Acceptance* v.
*Brañuela,* 61 D.P.R. 725 (De Jesús) (1943), cita precisa a
las págs. 726–730—la apelante volvió a insistir: "Que como
cesionaria de los derechos de la vendedora condicional de un
automóvil que fué capturado mientras transportaba bebidas
embriagantes sin pagar el impuesto prescrito por la ley, es
un tercero inocente cuyo interés no puede ser perjudicado por
la confiscación del vehículo prescrita por el artículo 62 de la
Ley de Bebidas" y el ilustrado Juez ponente volvió a aclarar
que "en el presente caso la apelante no nos ha puesto en con-
diciones de resolver la cuestión planteada en su alegato, pues
no tenemos base para asumir que sea ella un tercero inocente,
y a ella—que ahora lo afirma—incumbía alegarlo y probarlo"
y añadió el ilustrado Juez Sr. De Jesús: "Alega ahora por
primera vez la apelante que es de aplicación a su caso la regla
general al efecto de que en procedimientos civiles en que esté
envuelta la comisión de un delito o conducta criminal alguna,

la inocencia y la buena fe se presumen e invoca el artículo 85 de la Ley de Bebidas que dispone: 'Artículo 85.—Toda persona que infrinja o deje de observar las disposiciones de esta Ley o del reglamento que por virtud de- ella se promulgue; y toda persona que a sabiendas ayude, permita o de otro modo ayude a otra infringir o dejar de observar cualquier disposición de esta ley o del reglamento respecto a sus disposiciones, será culpable de delito menos grave (*misdemeanor*), cuando no se indique específicamente otra pena. . .' Concedemos que el cesionario de los derechos de un vendedor condicional de un automóvil que a sabiendas permita que dicho automóvil sea usado en la transportación de bebidas alcohólicas en violación de la ley, incurre en responsabilidad criminal a tenor de lo. dispuesto en el citado artículo 85. Siendo ello así, la apelante tiene a su favor la presunción de inocencia que invoca. Aceptando que la apelante tiene a su favor la presunción de tercero inocente, tiene derecho a que se resuelva si la confiscación prescrita por el artículo 62 perjudica sus derechos sobre el vehículo. Un estudio de las monografías contenidas en la obra *American Law Reports,* . . . donde se acopian y clasifican las decisiones de los tribunales, tanto federales como estatales, interpretativas de los diversos estatutos sobre la materia, revela el desacuerdo en que se hallan las distintas jurisdicciones con respecto a los derechos de terceros inocentes cuando el estatuto, como el nuestro, guarda silencio acerca de tales derechos. En Carolina del Sur, donde existía un precepto legal igual al artículo 62, supra, se resolvió que debía presumirse que la legislatura tuvo la intención de excluir de los efectos de la ley los derechos de terceros inocentes, de. esa forma evitando que el estatuto produjera injusticia en su aplicación. [Citas] En Tejas, un estatuto sobre la materia expresamente declara que el vehículo ilegalmente usado constituye un estorbo público y ordena que si el mismo tiene algún valor o es útil para algún uso legítimo, deberá ser vendido y su producto inmediatamente depositado

en la tesorería del Estado, y que en caso de no tener valor alguno, la propiedad deberá ser destruída. Al interpretarlo, a pesar de que no se hace mención de los derechos de terceros inocentes, los tribunales de aquel Estado han sostenido que el automóvil confiscado quedaba sujeto al gravamen del vendedor condicional. En otras palabras, que los derechos del vendedor condicional no eran afectados por la confiscación." (Cita)

Ahora viene el nudo gordiano de una opinión, que según veremos más adelante, el tiempo y el adelanto de las ciencias jurídicas, se han ocupado en rectificar corrigiendo los supuestos originales en que se basaba. Sigue la opinión:

"De otro lado, interpretando el artículo 3450 de los Estatutos Revisados de los Estados Unidos, de los cuales ha sido tomado el artículo 62 de la Ley de Bebidas, la Corte Suprema ha sostenido que el procedimiento de confiscación va dirigido contra el vehículo mismo y no contra sus dueños y que por consiguiente los derechos que sobre el vehículo puedan tener terceros inocentes no están protegidos, excepto en aquellos casos en que se demuestre que la posesión del vehículo ha sido obtenida por el infractor sin el consentimiento expreso o implícito del dueño o del tercero inocente, como sucede cuando el vehículo ha sido hurtado. En otras palabras, si el dueño o tercero interesado directa o indirectamente ha puesto el vehículo en posesión del infractor o de la persona bajo la cual actúa éste, los derechos del dueño o tercero interesado en tales circunstancias corren la suerte del uso a que el poseedor pueda someter el vehículo." (Citas)

El doble motivo por el cual se trae a nuestra jurisprudencia la doctrina anterior inmediata son los siguientes: "Aparte de que [1] las sentencias del Tribunal Supremo de los Estados Unidos son obligatorias para este tribunal, es además de aplicación [2] la regla de hermenéutica legal dispositiva de que al adoptarse un estatuto de otra jurisdicción, a menos que expresamente se prescriba lo contrario, la juris-

prudencia de la jurisdicción de su origen existente al tiempo de la adopción se entenderá incluída en los términos del estatuto. Por lo tanto, siguiendo por este doble motivo la interpretación que la Corte Suprema de los Estados Unidos ha dado al artículo 3450 de los Estatutos Revisados, tenemos que llegar a la irresistible conclusión de que el artículo 62 no protege los intereses de la apelante."

Veamos cuáles eran las sentencias del Tribunal Supremo de los Estados Unidos obligatorias para este Tribunal al momento de fallarse, en reconsideración el caso de *General Motors Acceptance* v. *Brañuela*, 61 D.P.R. 725 (De Jesús) (1943), cita precisa a la pág. 730. En la sentencia se alude a los casos de *Dobbins* v. *United States*, 96 U.S. 395, 24 L.Ed. 637 (Clifford) (1878) y *Goldsmith, Jr.–Grant Co.* v. *United States*, 254 U.S. 505, 65 L.Ed. 377 (McKenna) (1921). En realidad son cuatro casos; hay que intercalar entre los dos anteriores, el caso de *Weeks* v. *United States*, 232 U.S. 383, 58 L.Ed. 652 (Day) (1914), y el caso de *Boyd* v. *United States*, 116 U.S. 616, 29 L.Ed. 746 (Bradley) (1886), que según veremos en la conclusión final son los dos únicos casos de los cuatro citados que merecerán los honores de la posteridad.

El caso de *Dobbins* trata de la confiscación de una destilería porque (1) el arrendatario, ocupante y operador de la destilería no cumplió y se negó a llevar los libros requeridos por ley y a hacer las entradas correspondientes en dichos libros; que hizo entradas falsas en los libros de la destilería y omitió entrar en dichos libros las informaciones requeridas por ley con intención de defraudar las rentas y ocultar a los oficiales de la renta pública, hechos y circunstancias supuestas a hacerse constar y a registrarse en los antes referidos libros, con la intención de defraudar al Tesoro; que había rehusado mostrar los libros que se llevan en la destilería al ser requerido para ello por los oficiales de la renta pública en contravención al estatuto para tal caso previsto; (2) que la

destilería, los alcoholes destilados, y los aparatos para la destilación ocupados eran propiedad del arrendador, ocupante y operador y alguna otra persona desconocida y estaban supuestos a ser usados por sus dueños en un negocio de destilería en una forma fraudulenta contraria a la Ley del Congreso; (3) que la propiedad decomisada (*seize*) se usaba por sus dueños para defraudar a los Estados Unidos de la contribución a que están sujetos los alcoholes destilados por Ley y que al Gobierno de los Estados Unidos se le había defraudado de parte de dicha contribución, en violación de la Ley.

Según se explica en la opinión (pág. 638), durante todo el juicio, el dueño reclamante pareció asumir como teoría de su defensa contra la solicitud de decomisación, que él era una parte acusada y que estaba sometido a juicio por un delito criminal creado y definido por la Ley del Congreso. Contrario a ello, el ilustrado Juez ponente entendió que la decomisación iba dirigida contra la destilería y la propiedad real o personal usada en conexión con la misma, incluyendo la propiedad inmueble (*real estate*) que se utilizaba para facilitar la operación de destilar y que se hacía con el fin de producir ingresos y egresos y cualquier propiedad personal de la clase que allí se encontró, además de los alcoholes destilados y los alambiques.

El ilustrado Juez tampoco estimó necesario que el dueño de la propiedad decomisada tuviera conocimiento que el arrendatario y destilador estuviese cometiendo un fraude contra la renta pública para que la solicitud de decomisación, pudiera ser sostenida. Si el dueño sabiéndolo, toleraba y permitía que su tierra fuera usada como sitio para una destilería, la ley lo consideraba en la misma posición como si el dueño fuera destilador y dueño del terreno sobre el cual la destilería estuviera emplazada; y si en un caso como ese, el fraude se demostraba, el terreno quedaba decomisado, lo mismo que si el destilador fuera el dueño. .

Sigue la opinión: Hay casos, sin duda, en los cuales la sentencia de decomisación necesariamente lleva consigo, como una parte de la misma una convicción y sentencia contra la persona por el crimen cometido; y en esa situación de las alegaciones es claro que el procedimiento es uno de naturaleza criminal; pero, cuando la solicitud como en este caso, no envuelve la convicción personal del infractor por el delito cometido, el remedio de la decomisación es simplemente de naturaleza civil, y la convicción del infractor debe obtenerse, si acaso, en otro procedimiento totalmente independiente. Las decomisaciones, en muchos casos de delitos de felonía, no se producen en el Derecho común en el cual el procedimiento es uno sobre la cosa (*in rem*) hasta tanto el infractor sea condenado, ya que la Corona, según dice el Juez Story, no tiene derecho a los bienes y a los derechos sobre la cosa hasta tanto produzca la certificación de una convicción; pero esa doctrina, como el mismo ilustrado magistrado dice, nunca se aplicó a los secuestros y decomisaciones creados por un estatuto imponiendo un gravamen sobre la cosa, del cual deba conocer la sección dedicada a contribuciones de la Corte del Fisco, por la razón, que la cosa en tales casos es ante todo considerada como una ofensora, o mejor dicho, que la infracción está adherida a la cosa misma, lo mismo si la cosa es *malum prohibitum o malum per se*; añadiendo el ilustrado Juez que los mismos principios se aplican a procedimientos *in rem* dentro de la Ley de Almirantazgo.

Sigue la opinión: correspondencia con los puntos de vista antes expresados por el mismo ilustrado Juez, guarda un caso resuelto por éste en un período posterior, en el cual, enfatizó que la Ley del Congreso bajo estudio no establecía excepción de clase alguna, en el caso de que la infracción fuera o no fuera hecha con la colaboración de los dueños de la propiedad. Ni, dijo, el Juez, habrá nada nuevo que considerar en una disposición de esta clase. No es nada extraordinario en la aplicación de la Ley de Almirantazgo, actuando bajo el Dere-

cho de naciones, tratar el barco en el cual, o por el cual, o bajo cuyo maestre o tripulación, se incurra en una infracción o delito, como si fuera el ofensor, sin relación de clase alguna con la mala conducta personal o responsabilidad de su dueño en ese instante, ya que la necesidad en el caso requiere dicha declaración como el único medio para suprimir la infracción o el delito y asegurar la indemnización correspondiente por el daño inferido a la persona lesionada . . . nada puede ser más sencillo al criterio legal que la proposición que la infracción arriba definida está relacionada principalmente con la destilería y la propiedad inmueble y mueble usada en conexión con la misma, sin consideración alguna de la mala conducta o responsabilidad del dueño, más allá de la que necesariamente se desprende del hecho de haber arrendado la propiedad al destilador y haber tolerado que dicha propiedad fuere ocupada y usarla por el arrendatario como una destilería. Hay casos que surgen frecuentemente en los cuales se decomisa la propiedad debido a fraude, negligencia o conducta lesiva de aquellos a quienes les ha sido encomendado su posesión, cuidado y custodia, a pesar de encontrarse el dueño, por el otro lado, sin culpa; y el Juez Story destaca, en cuanto al último ejemplo citado, que dicha doctrina se aplica corrientemente a casos de contrabando y otras faltas bajo las Leyes de rentas, así como a otros casos de Embargo y prohibición de tráfico marítimo bajo las Leyes del Congreso.

Termina la parte de la opinión pertinente a esta cuestión litigiosa, con la siguiente frase: Conflictos de esta clase han surgido en la historia judicial de los Estados Unidos y siempre se ha sostenido en dichos casos que los actos del maestre y su tripulación obligan al interés del dueño del barco, tanto sea éste inocente como culpable y que el hecho del dueño arriar el barco a la mar bajo la dirección del maestre y su tripulación, somete implícitamente a dicho dueño a todo lo que la ley ha dispuesto como motivo de confiscación adscrito al barco por haber incurrido en una conducta ilegal o falaz.

El segundo caso de la Corte Suprema de los Estados Unidos, envuelto en esta cuestión litigiosa, es el caso de *Boyd* v. *United States*, 116 U.S. 616, 29 L.Ed. 746 (Bradley) (1886), cita precisa a las págs. 750-752. Se trata de una acusación por el Procurador General de los Estados Unidos para la Corte de Distrito del Distrito Sur de Nueva York en un caso de confiscación y decomiso contra treinta y cinco cajas de placas de vidrio decomisadas por el Colector para ser confiscadas a favor de los Estados Unidos bajo la Sec. 12 de la Ley para enmendar las Leyes de Rentas de Aduana de 22 de junio de 1874. Se declara por dicha sección que cualquier dueño, importador, consignatario, etc., quien, con intención de defraudar la renta pública, introduzca o intente introducir cualquiera mercadería importada mediante una factura falsa o fraudulenta, *affidavit*, carta o comunicación escrita, o mediante una declaración falsa, escrita u oral, o quien pueda ser culpable de cualquier acto u omisión por el cual los Estados Unidos puedan ser defraudados de sus legítimos impuestos, o cualquier parte de ellos que provengan de cualquiera mercadería o parte de ella, comprendida o que se refiera, a dicha factura, *affidavit*, carta, documento o declaración o afectados por cualquiera de dichas actuaciones u omisiones, será castigado por cada infracción con una multa no menor de $50 ó reducida a prisión por un término que no exceda de dos años, o ambas; y además de dicha multa, la mercancía será decomisada. Se reclamó la devolución de la mercancía decomisada alegándose que no fue decomisada de acuerdo con el procedimiento prescrito por Ley.

Contra esta alegación, el Procurador General ofreció una orden judicial dirigida a los reclamantes, requiriendo de ellos la presentación de la factura de las cajas. Los reclamantes, obedeciendo dicho requerimiento pero objetando la validez del procedimiento y la constitucionalidad de la ley, presentaron la factura; cuando la misma fue ofrecida como prueba se opusieron a su aceptación, por el fundamento, que en una

diligencia de confiscación no se puede obligar a los reclamantes a presentar dicha prueba, y que la Ley en tanto obliga a presentar dicha prueba para ser usada en contra de los reclamantes, es inconstitucional y nula. A pesar de la oposición, la prueba fue aceptada y el jurado trajo un veredicto confiscando las treinta y cinco cajas de placas de vidrio. El veredicto del jurado fue dejado sin efecto por ser contrario a las disposiciones de las enmiendas Cuarta y Quinta de la Constitución de los Estados Unidos, de acuerdo con los siguientes fundamentos de la opinión del Juez Bradley:

Existe una íntima relación entre las dos enmiendas. Cada una arroja una gran luz sobre la otra, ya que los registros y allanamientos irrazonables, prohibidos por la Enmienda Cuarta, son casi siempre hechos con el propósito de obligar a una persona a mostrar una prueba que lo incrimina, lo cual, en casos criminales se prohibe por la Enmienda Quinta; al declarar que una persona en un caso criminal no puede obligarse a servir de testigo contra sí mismo, por estar prohibido por la Enmienda Quinta, arroja luz sobre lo que puede ser un registro o allanamiento irrazonable dentro del significado de la Enmienda Cuarta. No hemos podido percatarnos que el registro de los libros particulares y documentos de una persona para utilizarlos como prueba contra él es algo sustancialmente distinto a obligarlo a servir de testigo en su contra. Creemos que está incluido en el propósito claro y significado de ambos términos. Nuestra opinión es clara que cualquier procedimiento instituido con el objeto de decretar la confiscación de la propiedad de una persona a causa de infracciones de ley cometidas por ella, aunque se puedan considerar en su forma como procedimientos civiles, en substancia son de naturaleza criminal. En este caso, el fundamento para confiscar, según lo declarado por la Sec. 12 de la Ley del 1874, que presenta la información, consiste de ciertas actuaciones fraudulentas contra la renta pública en relación con una mercancía importada, lo cual se reputa infracción

criminal por la Ley; y se declara que el infractor será multado por una cantidad que no exceda de $5,000 ni sea menor de $50, o reducido a prisión por un término que no exceda de dos años, o ambos; además la mercancía será confiscada. Ésas son las penalidades fijadas por los actos punibles, siendo la confiscación sólo una entre ellas. Si una acusación ha sido presentada contra los reclamantes, después de convictos, la confiscación de las mercancías puede ser incluida en la sentencia. Si el Procurador del Estado elige renunciar a la acusación y radicar una acción civil contra los reclamantes (esto es, civil en su forma) ¿puede él en virtud de esta extorsión borrar del procedimiento su aspecto criminal y privar a los reclamantes de sus inmunidades como ciudadanos y obtener de ellos por la fuerza la presentación de sus documentos particulares, o en la alternativa, una confesión de culpabilidad? Esto no se puede hacer. La confiscación, aunque técnicamente es un procedimiento civil, es en substancia y efecto uno criminal (cita de caso reciente). Siendo, por lo tanto, las acciones por penalidades y confiscaciones, ocasionadas por la comisión de infracciones contra la Ley, de una naturaleza cuasi-penal, entendemos que están comprendidas dentro de la clasificación de procedimientos criminales para todos los propósitos de la Enmienda Cuarta de la Constitución y de esa parte de la Enmienda Quinta que dispone que ninguna persona debe ser obligada en ningún caso criminal a ser un testigo en contra suya; y, más aún, somos de opinión que obligar al dueño de los bienes a ser confiscados a mostrar sus libros particulares y sus documentos es obligarlo a ser testigo en su contra, dentro del significado que tiene la Enmienda Quinta de la Constitución; y, asimismo, es lo equivalente a un registro y allanamiento irrazonable dentro del significado que tiene la Enmienda Cuarta.

Sigue la opinión: Aunque el procedimiento usado en este caso esté despojado de muchas de las incidencias agravantes del actual registro y allanamiento, no deja, según se dijo

antes, de contener sus esencias y substancias y persigue su mismo propósito cardinal. Puede decirse que es la misma cosa odiosa en su más leniente y menos repulsiva forma; pero las prácticas ilegítimas dentro de la constitucionalidad siempre dan su primer paso de esta manera, o sea, acercándose sigilosamente y desviándose cautelosamente de los modos rectos del procedimiento. Esto sólo puede evitarse adhiriéndonos al principio que las disposiciones constitucionales para la seguridad de la persona y la propiedad deben ser liberalmente interpretadas. Una estrecha y literal interpretación despoja a dichas disposiciones de la mitad de su eficacia y conduce a la depreciación gradual del derecho, como si éste consistiera más de mera palabrería que de substancia jurídica. Es el deber de las cortes mantenerse siempre vigilantes de los derechos constitucionales de los ciudadanos y no permitir ninguna usurpación furtiva de sus contenidos. Su lema debe ser *obsta principiis* (repugna al principio).

El tercer caso de la Corte Suprema de los Estados Unidos envuelto en esta cuestión, es el caso de *Weeks* v. *United States*, 232 U.S. 383, 58 L.Ed. 652 (Day) (1913), cita precisa a las págs. 654–656 resuelto bajo el mismo principio de inmunidad en cuanto a registros y declaraciones contra interés propio del caso de *Boyd*. Por una acusación de utilizar el correo para transportar ciertos cupones o boletos de una lotería en violación a la Sec. 213 del Código Penal, el acusado fue detenido sin orden de arresto por un oficial de la policía en la Union Station de la ciudad de Kansas, en Missouri, mientras otros agentes del orden público fueron a la residencia del acusado, penetraron en la misma, registraron la habitación del acusado y allí se apoderaron de algunos documentos y artículos, que posteriormente fueron entregados a un Alguacil de los Estados Unidos. En el mismo día los agentes del orden público regresaron a la residencia del acusado, acompañados del Alguacil y dicho Alguacil hizo un registro de la habitación llevándose de la misma ciertas cartas y sobres en-

contrados en la gaveta de un *chiffonier*. Ni el Alguacil ni los agentes del orden público tenían orden de allanamiento para proceder en esa forma. El acusado solicitó la devolución de los documentos y artículos, amparándose en las Enmiendas Cuarta y Quinta de la Constitución de los Estados Unidos.

La corte sentenciadora devolvió algunos documentos y artículos pero retuvo los que creyó conectados con la prueba del delito. Entre los documentos que retuvo estaban los boletos de la lotería, ciertos informes que se referían a la lotería encontrados por los agentes de orden público durante la primera visita y unas cuantas cartas escritas por el acusado sobre la lotería encontradas por el Alguacil durante la segunda visita a la habitación del acusado. Se objetó durante la vista del caso la aceptación de dicha prueba pero la objeción fue desestimada por la corte. La Corte Suprema de Estados Unidos revocó la convicción del acusado lograda con la prueba ilegalmente obtenida. He aquí algunos de los fundamentos de la corte:

La historia de la Enmienda Cuarta, según aparece de la opinión del Juez Bradley en el caso de *Boyd*, demuestra que la determinación de los autores de las Enmiendas a la Constitución federal fue dotar a dicha carta constitucional de una carta de inalienabilidad, procurando para el pueblo americano, entre otras cosas, aquellas garantías que se habían desarrollado en Inglaterra para proteger al pueblo contra registros y allanamientos irrazonables. La resistencia a tales prácticas estableció el principio, incorporado a la Ley fundamental como la Cuarta Enmienda, que la casa del hombre es su castillo y no puede ser invadido por ninguna autoridad corriente para registrar y tomar posesión de sus pertenencias y documentos. El Juez Cooley, en su tratado Constitutional Limitations (restricciones constitucionales) al estudiar esta particularidad de nuestra Constitución dice: "La máxima que 'la casa de cada hombre es su castillo' fue hecha parte de nuestra Ley constitucional en las cláusulas prohi-

biendo registros y allanamientos y siempre se le ha considerado como de un alto valor para el ciudadano."

Sigue la opinión: "Los esfuerzos desplegados por los tribunales y sus oficiales para traer al culpable cerca de su castigo no pueden ser ayudados por el sacrificio de aquellos grandes principios establecidos por años de empeños y sufrimientos incorporados hoy a la Ley fundamental de esta nación. El Alguacil de los Estados Unidos sólo hubiera podido violentar la casa del acusado provisto de una orden de allanamiento según lo requiere la Constitución, obtenida mediante una declaración jurada, describiendo con razonable detalle la cosa por la cual el allanamiento se ha hecho. Por el contrario, el alguacil actuó fuera de la sanción de la Ley, sin duda afrontado por su deseo de traer prueba adicional para ayudar al Estado y bajo color de autoridad de su título se atrevió a realizar un allanamiento de documentos personales en abierto desafío a la prohibición constitucional contra dicha manera de proceder. Bajo tales circunstancias, sin declaración jurada y una descripción detallada de la cosa, ni siquiera una orden judicial hubiera podido justificar tal procedimiento."

El cuarto caso de la Corte Suprema de los Estados Unidos, segundo de los citados en la opinión de este Tribunal en reconsideración—*General Motors Acceptance* v. *Brañuela*, 61 D.P.R. 725 (1943)—el caso de *Goldsmith, Jr.-Grant Co.* v. *United States*, 254 U.S. 505, 65 L.Ed. 377 (McKenna) (1912), cita precisa a las págs. 378–379—es una versión más contemporánea de la teoría del caso antes acotado incluso de las posibles filosofías, envueltas en el mismo, aunque la aparición de la crisis nacional que produce la Ley Volstead, no sea el tiempo opimo para recoger las espigas de una nueva cosecha más cerca del aura de domesticidad de las industrias caseras americanas que de las rudas tareas de la piratería internacional y la fabricación clandestina en gran escala.

La ley que se aplica en la segunda opinión de la Corte Suprema de Estados Unidos citada en el caso de *Brañuela* en reconsideración, es la Sec. 14 original de la Ley del Congreso sobre rentas del 13 de julio de 1866—14 Stat. at L. 151 capítulo 184 que pasó a ser la Sec. 3450 de la Compilación de los Estatutos Revisados, citada en nuestra opinión en reconsideración en el caso de *General Motors Acceptance* v. *Brañuela*, que dispone: "Cuantas veces cualesquier bienes o mercancías, para los cuales o en relación con los cuales, alguna contribución ha sido o pueda ser impuesta sean movidos o depositados u ocultados en cualquier sitio con la intención de defraudar a los Estados Unidos de dicha contribución, o cualquier parte de ella, dichos bienes y mercancías . . . serán confiscados; y en cada uno de dichos casos todos los barriles, barcos, cajas, o cualesquier otros paquetes de cualquier clase . . . respectivamente y todo barco, lancha, carreta y otros vehículos de cualquier clase y todos los caballos y otros animales y todas las cosas que se empleen en la locomoción o para el depósito u ocultación en cualquier sitio respectivamente, serán confiscados." (págs. 377 *in fine* y 378). El caso de *Goldsmith* trata de la confiscación de un automóvil Hudson, tasado en $800, acusado dicho automóvil de haber sido usado por tres personas en la conducción, depósito y ocultamiento de cincuenta y ocho galones de alcohol destilado sobre los cuales no se había impuesto contribución por los Estados Unidos ni había sido pagada.

La Compañía Grant había sido la vendedora del automóvil, y retenía sobre el mismo, título por la parte del precio que no haba sido pagada por el Sr. Thompson, siendo este Sr. Thompson quien había usado el carro en violación de la Sec. 3450 alegando que dicho uso ilegal había ocurrido sin que la Compañía Grant tuviera conocimiento del mismo, ni asimismo tuvieran conocimiento alguno de dicho uso ilegal los oficiales ejecutivos de la compañía, ni que tampoco tuvieran noticia o razón alguna para sospechar que la propiedad

sujeta al gravamen pudiera ser ilegalmente usada, la compañía radicó dentro del procedimiento una moción de veredicto dirigido por los siguientes fundamentos: (1) que la Sec. 3450 de la Compilación de Estatutos Revisados estaba en conflicto con el Art. 5 de las Enmiendas a la Constitución de los Estados Unidos ya que despojaba a la Compañía Grant de un derecho de propiedad sin el debido proceso de ley; (2) que dicha sección no podía interpretarse como que confiscaba el título de una tercera persona enteramente inocente del hecho delictivo y que la interpretación más apropiada de dicha sección, era que sólo cubría la confiscación del interés o título del malfechor; (3) que el interés o título reservado por la compañía nunca había sido enajenado y por esta razón no podía estar sujeto a la confiscación y que sólo el interés del malfechor podía ser confiscado.

El Juez declaró sin lugar la solicitud de veredicto dirigido por los fundamentos aducidos por el tercero inocente, y por el contrario, instruyó al jurado para rendir un veredicto encontrando al automóvil culpable de uso ilegal de la propiedad. En efecto, el jurado encontró al automóvil culpable del uso ilegal, y de acuerdo con dicho veredicto, se dictó una sentencia de condenación y decomiso. Pero como se había aceptado una fianza en lugar del automóvil, se ordenó que el Gobierno de los Estados Unidos recobrara de la Compañía Grant, como principal y del Sr. J. W. Goldsmith hijo, como fiador, la cantidad de $800 y las costas.

Es imposible comprender el hilo mágico de esta tela de araña sin acotar los fundamentos de la segunda decisión. El ilustrado Juez ponente, se expresa así: "Si este caso fuera el primero de su clase, el caso y sus aparentes paradojas podrían exigir una larga discusión para armonizar la sección 3450 con las pruebas aceptables a la conducta humana. Sus palabras, literalmente consideradas, confiscan cualquier propiedad ilícitamente usada aunque el dueño de la misma no haya participado o hubiera tenido conocimiento del uso ilegal.

Hay cierta fuerza persuasiva, desde luego, en la contención que, si ése es el inevitable significado de la sección, parece violar esa justicia en que se funda el debido proceso de ley requerida por la Constitución. Es, su consecuencia, que plausiblemente se nos urja que tal no ha podido ser la intención del Congreso; que necesariamente el Congreso ha debido tener en mente los hechos y las conductas del mundo, y que, dentro de las conveniencias de los negocios y de la vida misma, la propiedad es frecuente y algunas veces necesariamente puesta en la posesión de otra persona que no es el dueño. Y como resultado, es la contención aquí, que el Congreso solamente intentó condenar el interés que el poseedor pudiera tener en la propiedad para castigar su culpa y no confiscar el título de un dueño inocente."

"Considerada dentro de esta abstracción", continúa el ilustrado Juez ponente, "el argumento resulta formidable, pero hay otras y militantes consideraciones. El Congreso ha podido tomar en cuenta las necesidades del Gobierno, sus rentas y políticas y tuvo que enfrentarse con la necesidad de hacer alguna disposición contra cualquier violación o evasión de dichas rentas y las maneras y los medios de controlar dichas violaciones o evasiones. En los incumplimientos de las imposiciones contributivas, algunas clases de propiedad son medios que ayudan a dichos incumplimientos, y desde luego, puede decirse que el Congreso le impone el cuidado y la responsabilidad de tales propiedades a sus dueños para ayudar al cumplimiento de las prohibiciones de la ley y sus disposiciones punitivas, y para ello, le adscribe a la propiedad cierta personalidad, una posibilidad de convertirse en cómplice o principal culpable de la ofensa. En este sentido, hay cierta analogía con la ley de *Deo dandum* [cosa que debía darse a Dios] por la cual el bien mueble que fuera la causa inmediata de la muerte quedaba confiscado. [Se confiscaba a favor de la Corona para ser destinado a usos piadosos y distribuído en limosnas por el Limosnero Real.] En cuanto a la

razón supersticiosa que puede haber detrás de la regla, Blackstone añade que 'tales infortunios se deben en parte a la negligencia del dueño y por esta razón, el dueño puede propiamente ser castigado por dicha confiscación' y hacía observar, de paso, que 'un castigo parecido era el infringido por la Ley mosaica: "Si un buey embiste a un hombre hasta matarlo, el buey puede ser apedreado pero su carne no debe ser comida". Y entre los atenienses cualquiera que fuese la causa de la muerte de un hombre por algo que le cayera encima, la cosa debía ser exterminada o desterrada de los dominios de la República' . . . [Citas.] Pero aunque la razón para la sección 3450 fuese artificial o real, la misma está firmemente establecida en la jurisprudencia punitiva y remedial de los Estados Unidos para que pueda ser desplazada."

No es nuestra intención rebatir el delicado interés que hubiera podido tener el ilustrado Juez ponente del caso cuarto, segundo de los citados en el caso de *Brañuela* en reconsideración, de mantener a flote una tesorería nacional. Pero su razonamiento nos parece mas imbuido por la superstición que por la ciencia. He aquí una de esas malignas implicaciones de la Ley del Talión sometida a un proceso simbólico de purificación. Sólo que aquí no es cuestión de ojo por ojo y diente por diente, siempre susceptible de una razonable equivalencia, sino de un despojo cuantioso de propiedad por una pequeña merma de renta pública; de trocar en fariseismo la vindicta pública.

Continúa su análisis del caso el ilustrado Juez ponente: "El caso de *Dobbins Distillery* v. *United States*, 96 U.S. 395, 24 L.Ed. 637, es un ejemplo de las reglas que hemos hecho anteriormente. Cita y revisa los casos previamente resueltos, aplicando su doctrina y sosteniendo la constitucionalidad de dichas leyes; milita, en esta forma, contra el punto de vista que la sección 3450 no es aplicable a una propiedad cuyo dueño es inocente. En otras palabras, es la regla del caso de *Dobbins Distillery* v. *United States*, basada en casos pre-

viamente resueltos, que la cosa debe ser en primer término considerada como el infractor. Y este principio y su práctica tiene ejemplos en la Ley de almirantazgo . . . . La defensa rebate el razonamiento y los precedentes establecidos en los anteriores casos en una argumentación extensa dirigida en la objeción de la injusticia que representa hacer sufrir a una persona inocente por los actos de su malfechor y la ansiosa solicitud que debe ejercitar un tribunal ante tal situación y según se dice se ha expresado frecuentemente, como la razón que la ha impelido a declarar inconstitucionales leyes que ofenden la razón y la justicia. Las distintas situaciones se escalonan dentro de la contención y se dan ejemplos de lo que puede ser posible bajo la Ley si la contención fuere rechazada. Se dice que un vagón dormitorio puede ser confiscado si una botella de licor ilícito se ocupa sobre la persona de un pasajero y que un barco trasatlántico puede ser condenado a confiscación si un paquete de licor similar se recibe inocentemente y se transporta. Si tales posibilidades bajo esta sección estarían justificadas, *no estamos supuestos a considerarlas ahora.* Esta sección ha estado en vigor desde el 1866 y aún no ha sido objeto de tal amplitud en su aplicación. Cuando tal aplicación se haga habrá tiempo suficiente para pronunciarnos sobre este aspecto del caso. Además de esto nos reservamos opinar si esta sección puede cubrir propiedad hurtada de su dueño en alguna otra forma tomada de él sin relación de gestión o consentimiento."

Desde esta curiosa antinomia, que por un lado, establece que los procedimientos de confiscación son procedimientos *in rem* que no necesitan para nada de la voluntad del dueño o poseedor, y por el otro lado, establece que dichos procedimientos son de naturaleza criminal y necesitan de una previa declaración de intencionalidad criminal, siguiendo el viejo principio del Derecho común que le prohibía a la Corona disponer de la propiedad utilizada en el crimen antes de conseguir la declaración de culpabilidad del felón, se desarrolla la

jurisprudencia posterior de la Corte Suprema de los Estados Unidos. Nos conformaremos con citar aquella jurisprudencia, en torno a la cual, se ha desarrollado el debate de la reforma.

Tal vez sería conveniente puntualizar un aspecto de la antinomia que no ha ayudado ciertamente a esclarecer la cuestión de la constitucionalidad y que se produce en la controversia ideológica entre federalistas e integralistas, tan característica de la jurisprudencia constitucional de la Corte Suprema de Estados Unidos. Uno de los casos que mejor ilustra esta tensión es el caso de *Wolf* v. *Colorado*, 338 U.S. 25, 93 L.Ed. 1782 (Frankfurter) (1949), cita precisa a las págs. 1784–1788 L.Ed.

La cuestión envuelta en este caso se plantea por el ilustrado Juez ponente, al principio de la opinión, en forma de pregunta: ¿Deniega una condena de una Corte estatal por un delito estatal el "debido proceso de ley" que requiere la Enmienda Catorce, por el solo hecho de haberse admitido como prueba durante el juicio cierta evidencia obtenida en circunstancias tales que la hubieran hecho inadmisible en un proceso sobre la violación de una ley federal en una corte federal por constituir una infracción de la Enmienda Cuarta, según se aplicó en el caso de *Weeks* v. *United States*? Tan pronto se formula la pregunta la opinión del ilustrado Juez ponente la contesta en los siguientes términos: Contrario a los requerimientos y restricciones impuestas por la Carta de Derechos (Enmiendas del I al VIII) a la administración de la justicia criminal por la autoridad federal, la Enmienda Catorce no somete la justicia criminal de los Estados a limitaciones específicas. La noción que el "debido proceso de ley" garantizado por la Enmienda Catorce es un signo taquigráfico de las primeras ocho enmiendas de la Constitución y como tales están incorporadas al debido proceso de ley estatal ha sido rechazada una y otra vez por la Corte Suprema de Estados Unidos después de una impresionante deliberación.

Sigue la opinión: Con el propósito de determinar qué restricciones impone la cláusula del debido proceso de ley sobre los Estados al poner en vigor su ley criminal, la Corte Suprema de Estados Unidos, se adhiere a los puntos de vista expuestos en el caso de *Palko* v. *Connecticut*, 302 U.S. 319, 82 L.Ed. 288. Esta decisión nos habla con la gran autoridad, particularmente en cuestiones de libertad civil, que posee una corte que incluía al Juez Presidente Hughes, el Juez Brandeis, el Juez Stone y el Juez Cardozo para nombrar sólo a los que ya han muerto a esta fecha. Al rechazar la hipótesis que la cláusula del Debido Proceso unía la Carta de Derechos original de la Constitución a los Estados, el Juez Cardozo reafirmó el criterio de la Corte Suprema de los Estados Unidos de una más profunda y penetrante concepción de la cláusula del Debido Proceso. Así el concepto de debido proceso de ley no comprende requerimientos formales, ya fijados ni estrechos. Es una expresión que compendia todos esos derechos que los tribunales tienen que imponer porque resultan fundamentales a una sociedad libre. Pero los derechos básicos no se petrifican dentro de cualquier único tiempo, a pesar de que, como cuestión de experiencia humana, algunos no pueden ser retóricamente llamados verdades eternas. Está dentro de la propia naturaleza de una sociedad libre progresar en sus patrones de lo que les parece razonable y recto. Representando como lo hace un principio vivo el debido proceso no está confinado dentro de un catálogo permanente de lo que en determinado tiempo se haya considerado los límites o lo esencial de los derechos fundamentales . . . . La verdadera clave del problema que tiene que afrontar la judicatura al aplicar la cláusula del Debido Proceso no es preguntarse donde debe trazarse de una vez y para siempre la línea de lo inmutable sino reconocer que le corresponde a la corte recomponer continuamente dicha línea por un gradual proceso empírico de "inclusión y exclusión": *Davidson* v. *New Orleans*, 96 U.S. 97, 104, 24 L.Ed. 616, 619. Esto era lo que estaba en

concepción íntima del tribunal cuando por primera vez se le planteó el problema; a esta concepción íntima, el tribunal le ha sido siempre fiel, caso tras caso desde la decisión de *Davidson* v. *New Orleans*.

Sigue la opinión: La protección de la privacidad de cada persona contra la intromisión arbitraria de la policía, que es la verdadera substancia de la Enmienda Cuarta, es básica en una sociedad libre. Está así implícita en el concepto de una libertad ordenada, y como tal, puede ser impuesta contra los Estados a través de la cláusula del Debido proceso. El aldabonazo en la puerta, lo mismo de día que de noche, como preludio de un registro, sin autoridad de ley, pero solamente por la autoridad policial, no necesita del comentario de una historia contemporánea para ser denunciada como inconsistente con la concepción de los derechos humanos conservados como reliquias en la historia y en las cartas constitucionales básicas de los pueblos que hablan inglés. De acuerdo a esto, no vacilamos en decir que cuando un Estado sanciona afirmativamente la incursión de la autoridad policial en la privacidad, está precipitándose a algo opuesto a la garantía de la Enmienda Catorce. Pero las maneras como puede imponerse tal derecho básico da margen a ciertas interrogantes de distinta índole. Cómo puede ser neutralizada dicha conducta arbitraria, qué remedios contra ella se nos brindan, los medios por los cuales el derecho a la privacidad puede hacerse efectivo, son todas preguntas que no son para contestarse dogmáticamente como si pretendieran excluir las cambiantes soluciones que surgen de una razonable extensión del discernimiento sobre cuestiones no susceptibles de una solución cuantitativa.

Sigue la opinión: En el caso de *Weeks* v. *United States*, esta Corte sostuvo que en un proceso federal, la Enmienda Cuarta no permitía el uso de cualquier prueba obtenida a través de un registro y allanamiento ilegal. Esta norma se estableció por primera vez en el año 1914. No se extrajo de los

requerimientos explícitos de la Enmienda Cuarta; no se basó en ninguna legislación que expresara una política congresional para poner en vigor la Constitución. La decisión fue asunto de un criterio judicial implícito. Desde entonces se ha aplicado con frecuencia y nos hemos adherido firmemente a su principio. Pero la pregunta inmediata es si el derecho básico a la protección contra una arbitraria intromisión del poder policial requiere la exclusión de prueba lógicamente pertinente obtenida a través de un registro y allanamiento irrazonable proque en un proceso federal por un crimen federal deba ser excluida. Como cuestión de razón inherente al asunto, se puede suponer que ésta es una cuestión sobre la cual hombres que sientan un devoto interés por la protección del derecho a la privacidad pueden dar diferentes contestaciones. Cuando se descubre, el hecho que la mayoría de la agente en el mundo de habla inglesa no reconoce como vital a dicha garantía tal exclusión, dudamos de considerar ese remedio como algo comprendido dentro del remedio . . . . Sostenemos, por lo tanto, que en un proceso en una corte de un Estado por un delito de naturaleza estatal, la Enmienda Catorce no prohibe la admisión de prueba obtenida a través de un registro irrazonable . . . .

El caso de *Wolf* v. *Colorado*, fue revocado por el caso de *Mapp* v. *Ohio*, 367 U.S. 643, 6 L.Ed.2d 1081 (Clark) (1961) cita precisa a las págs. 1085–1092. El 23 de mayo de 1957 tres agentes de la policía de Cleveland llegaron a la casa del acusado apelante en dicha ciudad, siguiendo la información que "una persona a quien se le buscaba para ser interrogada en relación con un reciente atentado con explosivos, estaba escondida en dicha casa y que había allí una gran cantidad de arreos dedicados a tal plan de acción." La señorita Mapp y una hija suya de un matrimonio anterior vivían en el último piso de un dormitorio para dos familias. Al llegar a la casa, los agentes de la policía llamaron a la puerta requiriendo entrada, pero la acusada apelante, después de comunicarse por

teléfono con su abogado, rehusó admitirlos sin una orden de allanamiento. Después de informar al Cuartel la situación se quedaron rondando la casa. Los agentes de la policía pensaron otra vez en ganar la entrada cuando cuatro o más agentes se personaron en la escena. Cuando la señorita Mapp no vino inmediatamente a la puerta, por lo menos, una de las puertas de la casa fue forzada y los agentes de la policía lograron acceso dentro de la casa. Mientras tanto el abogado de la señorita Mapp llegó, pero los agentes de la policía, habiendo asegurado su propia entrada y persistiendo en su desafío a la Ley, no le permitieron al abogado ver a la señorita Mapp ni entrar en la casa. Según parece la señorita Mapp estaba a mitad de distancia entre los escalones del piso alto y la puerta de entrada, cuando los agentes de la policía, en esta forma altanera, irrumpieron en el vestíbulo. Ella les requirió que le mostraran la orden de allanamiento. Un papel que pretendía ser dicha orden le fue mostrada por uno de los agentes. Ella le arrebató el papel y se lo colocó en el seno. Se desarrolló un pequeño forcejeo, los agentes de la policía recobraron el papel y como resultado de dicho forcejeo, esposaron a la apelante por haber asumido una actitud beligerante al resistir que el oficial recobrara de la persona de ella el pretendido auto de allanamiento. Con una ruda obstentación vulgar de poder se echaron encima de la apelante, y un agente la agagarraba torciéndole la mano y ella chillaba y le suplicaba que la soltara porque le estaba haciendo daño. La apelante, con las esposas puestas, fue obligada a seguir escaleras arriba hasta su cuarto de dormir, en el cual, los agentes registraron un tocador, un gavetero y algunas gavetas. Los agentes examinaron un álbum de retratos y otros documentos personales de la apelante. El allanamiento se extendió al resto del segundo piso incluyendo el cuarto del niño, la sala, la cocina y un pequeño comedor. El sótano del edificio y un baúl guardado en él fueron también registrados. El material obsceno por cuya

posesión la apelante fue convicta finalmente se descubrió durante este extenso registro.

La opinión del caso de *Mapp* v. *Ohio*, contiene la más ordenada y confiable exposición de la cronología de las decisiones sobre registros y allanamientos, tanto en là esfera federal como en la estatal, revisados por la Corte Suprema de los Estados Unidos, destacando dos casos—*Boyd* v. *United States*, 116 U.S. 616, 29 L.Ed. 746 (Bradley) (1886) y *Weeks* v. *United States*, 232 U.S. 383, 58 L.Ed. 652 (Day) (1913) como aquellos que le han servido de pilares a las Enmiendas Cuarta y Quinta de la Constitución federal. Debidamente extractada dice la opinión del ilustrado Juez ponente Clark: "Setenta y cinco años hace que en *Boyd* v. *United States*, considerando la Cuarta y la Quinta Enmienda como comprendidas 'casi la una en la otra,' sostuvimos que los principios de dichas enmiendas 'se aplican a todas las intromisiones de parte del Estado y sus empleados a la santidad del hogar de un hombre y a la privacidad de su vida . . . .' . . . En su celoso esfuerzo por mantener la integridad de los derechos individuales, esta Corte le insufló nueva vida a la predicción de Madison que 'tribunales de justicia independientes . . . naturalmente encabezarían la resistencia contra cualquier violencia sobre los derechos expresamente consignados para la Constitución por la carta de derechos.' . . . En conclusión, la Corte se refería específicamente al uso de prueba lograda mediante un allanamiento 'inconstitucional'. Menos de treinta años después del caso de *Boyd*, en el caso de *Weeks* v. *United States*, la Corte Suprema de los Estados Unidos declaró que 'La Cuarta Enmienda . . . puso las Cortes de los Estados Unidos y los funcionarios federales, en cuanto al ejercicio de su poder y autoridad bajo limitaciones y restricciones garantizándole para siempre al pueblo, sus personas, casas, documentos y efectos personales protección contra toda clase de registros, allanamientos irrazonables, so pretexto de ley . . . y el deber de darle a dicha protección toda la fuerza y vigor necesarios es

obligatorio para todos encargados bajo nuestro sistema federal con el cumplimiento de la ley . . . .' Así, desde el año 1914 por la doctrina del caso de *Weeks*, por primera vez la Corte Suprema de los Estados Unidos, estableció que en un proceso federal la Enmienda Cuarta proscribió el uso de prueba conseguida a través de un registro y allanamiento ilegal . . . . Simplemente, significa que cualquier convicción por medio de allanamientos ilegales y confesiones coaccionadas no deben permitirse en las sentencias de las Cortes . . . . Hay ciertos casos de esta Corte que se refieren a la regla sentada por el caso de *Weeks* como una regla de evidencia. Pero el lenguaje llano e inequívoco del caso y su posterior paráfrasis en el caso de *Wolf*, es en el sentido, que la regla del caso de *Weeks* es una declaración constitucional que permanece inalterada en su totalidad. En el caso de *Byars* v. *United States*, 273 U.S. 28, 71 L.Ed. 520, una corte unánime resolvió que no se puede tolerar la doctrina, bajo nuestro sistema constitucional, que pruebas de un crímen descubierto por un agente federal al hacer un registro sin un auto de allanamiento legal, se puede usar contra la víctima del registro ilegal cuando se hace una oportuna objeción."

Sigue la opinión del caso de *Mapp* v. *Ohio*: "En el 1949, treinta y cinco años después de establecer la regla del caso de *Weeks*, esta Corte en el caso de *Wolf* v. *Colorado*, de nuevo por vez primera, discute el efecto de la Enmienda Cuarta a través del principio establecido en la Cláusula del Debido Proceso de la Enmienda Catorce . . . . Después de declarar que 'la seguridad de la privacidad del ser humano contra cualquier intromisión arbitraria de los agentes de policía' está implícita en el concepto de una ordenada libertad, y como tal puede hacerse valer contra los Estados de la Unión a través de la Cláusula del Debido Proceso . . . la corte declara que la diversidad de opiniones de los Estados Unidos ante la regla de exclusión de prueba de *Weeks* era impresionante y que en cuanto a este punto, no se debía echar a un lado las

experiencias de los Estados que consideraban la incidencia de dicha conducta demasiado delgada como para adoptar un remedio drástico que barriera con las reglas de evidencia correspondientes adoptadas por los Estados. Mientras en el 1949, antes de adoptar la nueva regla del caso de *Wolf*, casi dos terceras partes estaban en oposición a la anterior regla del caso de *Weeks*, ahora, más de la mitad de los que estaban opuestos, al volver a considerar la cuestión, por su propia iniciativa legislativa o judicial, han adoptado en parte o en su totalidad la regla del caso de *Weeks*. Es de interés significativo, que entre los Estados que decidieron seguir la regla del caso de *Weeks* está California, cuyo Estado de acuerdo con su más alto tribunal declara que se ha visto obligado a seguir dicha regla porque los otros remedios han fallado en su totalidad al tratar de cumplir con las disposiciones constitucionales . . . . En relación con este caso de California, es conveniente destacar que el segundo fundamento elaborado en el caso de *Wolf* al sostener su posición contra la regla de exclusión del caso de *Weeks* en cuanto a los Estados, era, que se habían provisto otros medios para garantizar el derecho a la privacidad . . . . Cinco años después del caso de *Wolf*, contestando una solicitud formulada término judicial tras término judicial, en el sentido, que se revocara la doctrina del caso de *Wolf* en cuanto a dejar sin efecto la regla de exclusión del caso de *Weeks*, la Corte indicó que eso no debía hacerse hasta tanto se le diera a los Estados una adecuada oportunidad para adoptar o rechazar la regla del caso de *Weeks* . . . . Hoy hemos vuelto a examinar la documentación constitucional del derecho a la privacidad, libre de cualquier intromisión estatal y después de sus doce años en nuestra jurisprudencia, estamos obligados a cerrar la última puerta de la Corte que permanecía abierta a una prueba obtenida por violación legal de los agentes públicos, en abierto abuso de un derecho básico, reservado a toda persona como una garantía específica contra esa misma conducta ilegal. Resolvemos que cualquier

prueba obtenida por registros y allanamientos ilegales en violación de la Constitución, por esa misma autoridad constitucional, no es admisible en las Cortes de los Estados."

Concluyendo, la opinión del caso de *Mapp* v. *Ohio*, termina así: "Además de que al sostener nosotros que la regla de exclusión es una parte esencial de ambas, la Cuarta Enmienda y la Enmienda Catorce, no es solamente el resumen lógico de los casos anteriores, sino también una cuestión de sentido. No existe un estado de guerra entre nuestra Constitución y el sentido común. En la actualidad, un fiscal federal no puede hacer uso de una prueba ilegalmente obtenida, pero en la otra acera del frente, un fiscal estatal, puede hacer uso de dicha prueba ilegal, a pesar de estar supuesto a actuar bajo las prohibiciones en vigor de la misma Enmienda. De esta manera, el Estado, admitiendo prueba ilegalmente obtenida, sirve para estimular la desobediencia a la Constitución federal que está supuesto a sostener. A pesar de que, según se dijo en el caso de *Elkins* [364 U.S. 221] 'la verdadera esencia de un federalismo saludable depende en evitar cualquier conflicto entre las cortes estatales y federales.' "

En el caso de *One Plymouth Sedan* v. *Pennsylvania*, 380 U.S. 693, 14 L.Ed.2d 170, hace crisis, como parte de la regla de exclusión, las llamadas confiscaciones de naturaleza civil de propiedades utilizadas en la comisión de un crimen. Representa una dramática victoria de la ciencia del Derecho contra la superstición de la expiación de los objetos y un impresionante crédito a los ilustrados Jueces ponentes Bradley (1886) y Day (1913), de los casos de *Boyd* v. *U.S.* y *Weeks* v. *U.S.*, anteriormente acotados.

Los hechos fueron los siguientes: En la madrugada del 16 de diciembre de 1960, dos agentes de la Junta de Control de Licores de Pennsylvania, estacionados cerca de Camden, Nueva Jersey, al acercarse al Puente Benjamín Franklin, observaron un automóvil Plymouth Sedan del 1958, con tablillas de Pennsylvania que corría hacia el puente en dirección

de Philadelphia, Pennsylvania. Los agentes, habiendo notado que el carro estaba sobrecargado en la parte trasera, hundido, lo siguieron al cruzar el puente hasta Philadelphia. Se detuvieron a poca distancia dentro de la ciudad, se identificaron e interrogaron al dueño George McGonigle. Los agentes, entonces, registraron el automóvil, en la parte trasera y el baúl, encontraron treinta y una cajas de licor sin los sellos de arbitrios adheridos. El carro y el licor fueron confiscados y el dueño McGonigle arrestado y acusado de una violación al estatuto de Pennsylvania. Los agentes no tenían orden de allanamiento ni mandamiento de arresto alguno. De acuerdo con el estatuto de Pennsylvania, el Estado radicó una petición para confiscar el automóvil. Durante la vista, McGonigle, en tiempo, solicitó la desestimación de la confiscación por el fundamento que la confiscación del automóvil dependía de presentación de prueba obtenida ilegalmente en violación de la Enmienda Cuarta de la Constitución según se aplica en virtud de la Enmienda Catorce.

La corte sentenciadora ordenó la devolución después de haber concluido, que el allanamiento se basó en prueba ilegalmente obtenida, ya que de acuerdo con las circunstancias particulares del caso, los agentes habían actuado sin causa probable. Una corte intermedia de apelación revocó la orden de devolución y la Corte Suprema de Pennsylvania confirmó la corte intermedia, por el fundamento que la regla de exclusión del caso de *Mapp* v. *Ohio*, como parte esencial de la Enmienda Cuarta y de la Enmienda Catorce, se aplica sólo a procesos criminales y no es aplicable a procedimientos de confiscación que la corte siempre ha estimado como procedimientos civiles por su naturaleza. En la opinión del caso de *One Plymouth Sedan* v. *Pennsylvania*, objeto de esta glosa, la Corte Suprema de los Estados Unidos revocó la decisión de la Corte Suprema de Pennsylvania por los siguientes fundamentos:

Como se ha reconocido por esta Corte (Corte Suprema de los Estados Unidos), el caso principal nuestro sobre registros

y allanamientos es el caso de *Boyd* v. *United States*, 116 U.S. 616, 29 L.Ed. 746 (1886), cuyo caso no era un caso criminal sino un procedimiento para confiscar treinta y cinco cajas de placas de vidrio ilegalmente importadas sin pagar los derechos de Aduana . . . . En el citado caso de *Boyd* el Juez ponente Bradley se expresó así: Nuestra opinión es clara que cualquier procedimiento instituido con el objeto de decretar la confiscación de la propiedad de una persona a causa de infracciones de ley cometidas por ella, aunque se puedan considerar en su forma como procedimientos civiles, en substancias son de naturaleza criminal. En este caso, el fundamento para confiscar, según lo declarado por la Sec. 12 de la Ley del 1874 que presenta la información, consiste de ciertas actuaciones fraudulentas contra la renta pública en relación con una mercancía importada, lo cual se reputa infracción criminal por la ley; y se declara que el infractor será multado por una cantidad que no exceda de $5,000 ni sea menor de $50, o reducido a prisión por un término que no exceda de dos años, o ambas; además la mercancía será confiscada. Esas son las penalidades fijadas por los actos punibles, siendo la confiscación sólo una entre ellas. Si una acusación ha sido presentada contra los reclamantes, después de convictos, la confiscación de las mercancías puede ser incluida en la sentencia. Si el Procurador del Estado elige renunciar a la acusación y radicar una acción civil contra los reclamantes (esto es, civil en su forma) ¿puede él en virtud de esta extorsión borrar del procedimiento su aspecto criminal y privar a los reclamantes de sus inmunidades como ciudadanos y obtener de ellos por la fuerza la presentación de sus documentos particulares, o en la alternativa, una confesión de culpabilidad? Esto no se puede hacer. La confiscación aunque técnicamente es un procedimiento civil, es en substancia y efecto uno criminal . . . . Siendo, por lo tanto, las acciones por penalidades y confiscaciones, ocasionadas por la comisión de infracciones contra la Ley, de una naturaleza cuasi penal, entendemos que están

comprendidas dentro de la clasificación de procedimientos criminales para todos los propósitos de la Enmienda Cuarta de la Constitución.

Sigue la opinión de *One Plymouth Sedan* v. *Pennsylvania*: El Estado además arguye que el pronunciamiento inequívoco del caso de *Boyd*, en el sentido, que la Enmienda Cuarta se aplica a procedimientos de confiscación lo mismo que a procedimientos criminales, ha sido debilitado por las aseveraciones de la Corte Suprema de Estados Unidos en los casos de *United States* v. *Jeffers*, 342 U.S. 48, 54, 96 L.Ed. 59, 65 y *Trupiano* v. *United States*, 334 U.S. 699, 710, 92 L.Ed. 1663, 1671. Contrario al caso de *Boyd*, los casos de *Jeffers* y *Trupiano*, no fueron procedimientos de confiscación; eran casos de procedimiento criminal federal. En ambos casos la Corte Suprema de Estados Unidos sostuvo que prueba obtenida en violación a la Enmienda Cuarta no era admisible sin que obstara que la prueba fuera de contrabando. Como acotación marginal (*dictum*), sin embargo, ya que el punto en controversia no estaba sometido a decisión, la Corte expuso en esos (dos) casos, que la regla que dicho contrabando debía ser excluido como prueba ilegalmente obtenida, no significaba que el Estado estaba obligado a devolver a Jeffers los narcóticos ilegalmente importados o el alcohol o mosto todavía sin registrar de Trupiano.

Continúa la disertación del ilustrado Juez ponente Goldberg: La naturaleza del contrabando envuelto en esos (dos) casos claramente explica las aseveraciones de la Corte. Tanto el caso de *Trupiano* como el de *Jeffers* se refiere a objetos cuya posesión, por sí misma, constituyen un delito. La reposesión por Jeffers y Trupiano de unos objetos que por su naturaleza constituyen un contrabando hubiera sometido a Jeffers y Trupiano a acusaciones criminales. La entrega del contrabando hubiera frustrado claramente la política del Estado prohibiendo la posesión de dichos objetos.

Es evidente—continúa el ilustrado Juez ponente en este caso—que la naturaleza de la propiedad aquí envuelta, aunque sea considerada como contrabando en Pennsylvania, es distinta. No hay nada, ni siquiera remotamente criminal, en poseer un automóvil. Es solamente el alegado uso al cual dicho automóvil se dedicó el que podría someter a Mr. McGonigle a la posible pérdida del automóvil. Y se concede que el Estado no puede establecer ningún uso ilegal sin mostrar la prueba obtenida por un registro, que se objeta por haberse hecho en forma contraria a lo que ordena la Constitución. Además, la devolución del automóvil a su dueño no le sometería a ningún proceso criminal por su posesión o frustraría ninguna política pública sobre automóviles como tales . . . . Entonces, no tenemos ante nos un caso en alguna forma análogo al contrabando envuelto en los casos de Jeffers y Trupiano y dichos casos, de ninguna manera, pueden ser considerados contrarios a la continuidad válida del caso de *Boyd*, caso que como el presente, se refiere a una propiedad que no resulta intrínsecamente ilegal.

He aquí la última parte de la opinión del ilustrado Juez Goldberg: Finalmente, según el Sr. Juez Bradley lo puntualiza con gran habilidad, un procedimiento de confiscación es de carácter cuasi criminal. Su propósito, lo mismo que en el procedimiento criminal es establecer una penalidad por haberse cometido un delito contra la Ley. En este caso, McGonigle, el dueño y el conductor del automóvil fue arrestado y acusado de un delito contra las leyes de bebidas de Pennsylvania. . . . Si hubiese sido declarado culpable de cualquiera de las posibles infracciones de la ley aludida, estaría sujeto, en primera ofensa al pago de una multa mínima de $100 y máxima de $500. En este procedimiento de confiscación estuvo sujeto a la pérdida de su automóvil, el cual durante el tiempo de la confiscación tenía un valor estimado de aproximadamente $1,000, una cantidad mayor que la multa máxima en el procedimiento criminal. Sería anómalo por cierto, bajo

estas circunstancias, sostener que en un procedimiento crimi-
nal la prueba ilegalmente obtenida puede ser excluida, mien-
tras que en un procedimiento de confiscación en el cual se
requiere la determinación de que ha cometido una violación
del estatuto criminal, la misma prueba ilegalmente obtenida
puede ser admitida.([11]) Que la confiscación es claramente
una penalidad impuesta por un delito y puede resultar en
un castigo mayor que el que se impondría en un proceso
criminal, de hecho ha sido reconocido por las propias Cortes
de Pennsylvania. En el caso de *Commonwealth* v. *One 1959
Chevrolet Impala Coupe*, que envuelve una confiscación en
1962, la Corte Superior de Pennsylvania, al afirmar el ejer-
cicio de una discreción para dejar sin efecto la confiscación
que motivara un procedimiento criminal declaró: "Le pareció
a la Corte de anterior instancia que hacer que este hombre
pagara la suma de $500.00 de multas, junto con las costas
del procedimiento y los gastos de almacenaje del automóvil
era suficiente castigo bajo todas las circunstancias. Confiscar
además un Chevrolet Impala Coupe del 1959 le pareció a la
corte de anterior instancia fuera de proporción enteramente
con el crimen cometido. No podemos decir que la corte ante-
rior abusara de su discreción al así actuar. 201 Pa. Super.
145, 150; 191 A.2d 717, 719." En resumen, concluimos que
por la naturaleza del procedimiento de confiscación, tan bien
descrito por el Sr. Juez Asociado Bradley en el caso de *Boyd*
y las razones que guiaron a esta Corte a sostener que la regla
de exclusión del caso de *Weeks* v. *United States*, supra, es
obligatoria a los Estados bajo la Enmienda Catorce, tan bien
articulada por el Sr. Juez Asociado Clark en el caso de *Mapp*,
sostiene la conclusión que dicha regla de exclusión es aplicable

---

"([11]) Esta Corte en *Boyd* v. *United States*, supra, 116 U.S. at 638,
29 L.Ed. at 753, rechazó cualquier argumento en cuanto a que el carácter
técnico de la confiscación como un procedimiento *in rem* sobre la cosa
tenga algún efecto sobre el derecho del dueño de la cosa para presentar
como defensa cualesquiera violaciones de sus derechos constitucionales. . . ."

a procedimientos de confiscación iguales al que está envuelto en este caso.

Para una constatación doctrinal posterior del caso de *Mapp* v. *Ohio*, en algunos aspectos de la exclusión de prueba ilegalmente obtenida, véanse: *Ker* v. *California*, 374 U.S. 23, 10 L.Ed.2d 726 (Clark) (1963), cita precisa a las págs. 30–33 U.S., 735–737 L.Ed.; *Stoner* v. *California*, 376 U.S. 483, 11 L.Ed.2d 856 (Stewart) (1964), cita precisa a las págs. 490 U.S., 861 L.Ed.; *Aguilar* v. *Texas*, 378 U.S. 108, 12 L.Ed.2d 723 (Goldberg) (1964), cita precisa a las págs. 111 U.S., 726–727 L.Ed.; *Stanford* v. *Ohio*, 379 U.S. 476, 13 L.Ed.2d 431 (Stewart) (1965), cita precisa a las págs. 481–482 U.S., 434–435 L.Ed.; *Preston* v. *United States*, 376 U.S. 364, 11 L.Ed.2d 777 (Black) (1964), cita precisa a las págs. 780–781. Para una igual constatación doctrinal posterior del caso de *One 1958 Plymouth Sedan* v. *Commonwealth of Pennsylvania*, sobre la naturaleza penal de la confiscación etc., véanse *State* v. *La Bella*, 212 A.2d 192 (Conklin) (Junio 28, 1965), cita precisa a las págs. 196–197; *Carson* v. *State*, 144 S.E.2d 384 (Grice) (Sept. 14, 1965), cita precisa a la pág. 386; *State* v. *Simpson*, 137 N.W.2d 391 (Gordon) (Nov. 2, 1965), cita precisa a la pág. 393 *in fine*; *United States* v. *One 1964 Chevrolet Impala Automobile*, 247 F.Supp. 329 (Hemphill) (Nov. 18, 1965), cita precisa a la pág. 334 *in fine*; *United States* v. *Maroney*, 355 F.2d 302 (Freedman) (Enero 11, 1966), cita precisa a la pág. 311; *Williams* v. *Williams*, 221 N.E.2d 622 (Nichols) (Julio 22, 1966), cita precisa a las págs. 625–626; *Del Presto* v. *Del Presto*, 223 A.2d 217 (Consodine) (Sept. 22, 1966), cita precisa a las págs. 217–218; *Cooper* v. *State of California*, 35 U.S. L.W. 4209 (Black) (Feb. 20, 1967), cita precisa a la pág. 4210; véanse además *"Constitutional Law—Searches and Seizures—Illegally Seized Evidence Barred in a Forfeiture Action"* (Glosa en torno al caso de One 1958 Plymouth Sedan) Vol. 11 Vill. L. Rev. No. 1, págs. 163–166, cita precisa

a la pág. 166 (1965); *"The Fourth Amendment and the Exclusionary Rule in Civil cases"* 43 Denver Law Journal 511, cita precisa a las págs. 516–517 (1966); *"Statutory Forfeitures—Extension of the Exclusionary Rule to Civil Actions"* 40 Tul. L. Rev. 672, cita precisa a las págs. 673 y 676–677; *"Evidence—Constitutional Law—Evidence Seized by Police Without Warrant or Probable Cause Excluded in Forfeiture Action"*—40 Notre Dame Law. 673, cita precisa a las págs. 674–675 (1964–65); *"Lawfulness of Seizure of Property used in Violation of Law as Prerequisite to Forfeiture Action or Proceeding"*, 8 A.L.R.3d 473, cita precisa a las págs. 480–482 (1966).

Tal vez sea conveniente a la mejor comprensión de la cuestión litigiosa, acotar el desenvolvimiento legislativo de la Sec. 3450 de los Estatutos Revisados de los Estados Unidos. Dicha disposición deriva de la Sec. 14 de la Ley de 13 de julio de 1866—14 United States Statutes at Large 151 (edición de Little, Brown and Company de 1868) que dispone:

Sec. 14—En el caso de cualesquiera mercaderías o artículos de comercio para o respecto a los cuales cualquier contribución ha sido o será impuesta, o cualesquiera materiales, utensilios o vasijas usados o destinados a ser usados para o utilizados en la producción de tales mercaderías o artículos de comercio que sean removidos, depositados u ocultados, en cualquier sitio, con la intención de defraudar a los Estados Unidos de tal contribución, o cualquier parte de ella, toda mercadería y artículos de comercio, y todos los materiales, utensilios y vasijas, respectivamente serán confiscados; y en todos estos casos, y en todo caso en donde cualquier mercancía o artículo de comercio sea confiscado bajo esta ley, o cualquier otra ley del Congreso relativa a rentas internas, todos y cada uno de los barriles, vasijas, cajas u otros envases de cualquier clase, que contengan, o que hubieren contenido, tales mercaderías o artículos de comercio, respectivamente, y toda embarcación, bote, carreta, carruaje, u otro medio de transportación cualquiera, y todo caballo u otro animal, y todas las cosas utilizadas en la remoción, depósito u ocultación de las mismas, respectivamente, serán confiscadas; y toda per-

sona que remueva, deposite u oculte, o esté complicada en la remoción, depósito u ocultación de cualesquiera mercaderías o artículos de comercio para o respecto a los cuales cualquier contribución ha sido o será impuesta, con intención de defraudar a los Estados Unidos de cualquier contribución o parte de ella, será multada en una cantidad que no exceda de quinientos dólares.

De acuerdo con la tabulación *B* del apéndice de las disposiciones incluidas en el Código de Rentas Internas—53 United States Statutes at Large, pág. XLI, (1939)—la Sec. 3450 se divide en dos nuevas secciones: la Sec. 2807 y la Sec. 3321(a)(b) del Código de Rentas Internas, que en cuanto a implementos y materiales utilizados en la destilación de alcoholes, dispone: Sec. 2807; Todas las pailas, alambiques u otros recipientes, herramientas e implementos, usados en la destilación o rectificación, decomisados bajo cualesquiera de las disposiciones de este capítulo y todo el material sujeto a confiscación, junto a cualquier máquina o cualquiera otra maquinaria conectada a la misma y todos los barriles vacíos y granos o cualquier otro material propio para la destilación, podrá ser, bajo la dirección de la corte en la cual se haya solicitado la confiscación, vendido en pública subasta y del producto de dicha subasta, después de deducir los gastos de la venta, se dispondrá de acuerdo con lo establecido por ley; la Sec. 3321(a)(1) que dispone: (a) penalidad—Cualquier persona que mueva, deposite u oculte, o tenga algo que ver con el acto de mover, depositar u ocultar cualesquiera bienes o mercancías para los cuales o con respecto a los cuales se haya impuesto una contribución, con la intención de defraudar al Gobierno de los Estados Unidos de dicha contribución o parte de la misma será castigado con una multa no mayor de $5,000 ó prisión por un término no mayor de tres años o ambas; (b) confiscación (1) (bienes)—Cuantas veces cualesquiera bienes o mercancías para o en relación a los cuales se haya impuesto una contribución o cualesquiera materiales,

utensilios o recipientes propios o que se intenta usar para la elaboración de dichos bienes y mercancías, sean movidos, depositados u ocultados en cualquier sitio con la intención de defraudar a los Estados Unidos de dicha contribución, o cualquiera parte de la misma, todos dichos bienes y mercancías y todos dichos materiales utensilios y recipientes, respectivamente, serán confiscados; (b) (2) bultos: en cada uno de dichos casos todos los toneles, recipientes, cajas de mercancías o cualesquiera otros paquetes de cualquier clase que contengan o que hayan podido contener dichos bienes o mercancías, respectivamente, quedarán confiscados; (b) (3) Cualquiera embarcación, lancha, carreta, o cualquiera que sea el medio de locomoción y todos los caballos y otros animales y todas las cosas usadas en la conducción, depósito u ocultación de los mismos, respectivamente, serán confiscados.

Por último debemos, simplemente enumerar, por ser legislación cuasi contemporánea, la enmienda que sufre la Sec. 3321 (a) (1) del Código de Rentas Internas de 1939 por la Sec. 7206 (4) del Código de Rentas Internas de 1954—26 U.S.C.A. § 7206, pág. 207 (ed. 1955)—y la Sec. 3321 (b) (1) del Código de Rentas Internas de 1939, por la Sec. 7301 del mismo Código de Rentas Internas de 1954.

Veamos, ahora, como se han ido desarrollando en la jurisprudencia puertorriqueña los principios establecidos en la decisión de *General Motors Acceptance* v. *Brañuela* (en reconsideración), decisión en que todavía parece descansar la opinión de la mayoría en el presente caso. El caso siguiente es el de *Torres* v. *Buscaglia*, 68 D.P.R. 336 (1948) (Todd, Jr.), cita precisa a las págs. 338–339. Se trata de la confiscación de un automóvil propiedad del apelante José A. Torres Plata por haberse sorprendido dicho vehículo en Juana Díaz transportando dos latas conteniendo espíritus destilados sin que se hubiesen pagado los arbitrios correspondientes. La ley aplicada al caso fue el Art. 62 (1) de la Ley de Espíritus y Bebidas Alcohólicas de Puerto Rico—Ley Núm. 6 de 30 de

junio de 1936 3a. Leg. Ext., pág. 45—que disponía: "El Tesorero queda por la presente autorizado para confiscar cualquier vehículo, bote, lancha, o cualquier embarcación marítima o aérea que se capture cargando o en el momento de cargar o de estar transportando, llevando o trasladando espíritus destilados o bebidas alcohólicas fabricadas, importadas, destiladas o rectificadas ilegalmente y sobre los cuales no se hubiesen pagado los impuestos prescritos por esta Ley; y los mismos serán vendidos en pública subasta para beneficio de El Pueblo de Puerto Rico; Disponiéndose, que el Tesorero, a su discreción, y si el servicio público así lo requiere, podrá designar no más de cinco (5) de dichos vehículos o botes de motor para uso de los funcionarios y agentes debidamente autorizados por el Negociado de Bebidas Alcohólicas y Narcóticos" y el Art. 97 de la misma Ley que disponía: "Siempre que el Tesorero de Puerto Rico esté facultado por esta Ley para vender artículos o productos confiscados por él o por sus agentes, la persona agraviada podrá apelar ante la correspondiente corte de distrito, y dicha corte tendrá jurisdicción, después de ser oída la persona, para confirmar, revocar, o modificar la decisión del Tesorero. Dicha apelación deberá radicarse dentro de los diez (10) días siguientes a la fecha de la notificación a la parte interesada."

Los fundamentos de la apelación presentada por Torres de acuerdo con las disposiciones del Art. 97, arriba transcrito, fueron los siguientes: (1) que el apelante no había cometido delito alguno; (2) que no se había seguido el debido procedimiento de ley, y (3) que se había cometido un embargo arbitrario e ilegal contra la propiedad del apelante. Contestando el señalamiento de errores, la opinión del ilustrado ponente, expone: "La prueba creída por la corte, demostró que el apelante, a requerimiento del policía que había ocupado las latas de ron que fueron lanzadas del automóvil del apelante cuando era guiado por otra persona, llevó voluntariamente el vehículo al cuartel . . . . En el caso de *General*

*Motors Acceptance Corp.* v. *Brañuela*, 60 D.P.R. 696, 61 D.P.R. 725, resolvimos que las confiscaciones que autoriza el artículo 62, supra, no infringe la garantía constitucional sobre el debido proceso de ley, debido a que el artículo 97, supra, da al dueño o persona interesada en el vehículo amplia y suficiente oportunidad de ser oído . . . . Arguye el apelante que por el hecho de no haber sido ocupadas las dos latas de alcohol dentro del automóvil éste no puede ser confiscado. Los hechos probados demuestran que al ser perseguido el automóvil del apelante por un policía en motocicleta, se lanzaron a la cuneta las dos latas las cuales al ser ocupadas contenían alcohol. El artículo 62, supra, dispone que puede confiscarle cualquier vehículo o que se capture 'cargado o en el momento de cargar o de estar transportando, llevando o trasladando espíritus destilados o bebidas alcohólicas, etc.' Habiéndole dado crédito la Corte inferior al testimonio del policía de que notó cuando desde el automóvil en movimiento se lanzaron las latas, forzoso es concluir que dichas latas se estaban transportando, llevando y trasladando dentro del vehículo . . . ."

El caso siguiente es el de *Martínez* v. *Buscaglia*, 69 D.P.R. 438 (1948) (De Jesús), cita precisa a la pág. 440. De acuerdo con la Sec. 62 de la Ley Núm. 6 de 1936, anteriormente acotada, el Tesorero de Puerto Rico confiscó un vehículo de motor utilizado para transportar bebidas alcohólicas, sobre cuyas bebidas, no se habían pagado los arbitrios correspondientes. La dueña del vehículo recurrió a la corte inferior solicitando se declarara la nulidad de la confiscación, de acuerdo con lo resuelto en el caso de *Pueblo* v. *Decós*, 62 D.P.R. 148 (Todd hijo) (1943), cita precisa a las págs. 153–154, en cuyo caso se resolvió, ser ilegal el registro del automóvil por haberse verificado sin una orden que lo autorizara y sin que existiese causa probable para tal registro. En el caso de *Martínez*, el Tesorero admitió la ilegalidad del registro pero alegó que esa circunstancia no afectaba la validez de la confiscación. De acuerdo con el ilustrado Juez ponente, la cuestión

litigiosa se reduce a determinar si concedida la ilegalidad del registro, la orden de confiscación es nula.

La opinión empieza aclarando que: "debemos tener presente que no estamos revisando una causa criminal en cuyo caso una sentencia basada en todo o en parte en evidencia ilegalmente obtenida y oportunamente objetada debería ser revocada. Por el contrario, estamos revisando una decisión dictada en un procedimiento *in rem* en el cual los derechos personales del dueño de la cosa no están en controversia. En consecuencia las garantías constitucionales contra registros ilegales no tienen aplicación *Boyd* v. *United States*, 116 U.S. 616, 623 (1866). Este punto, aunque nuevo en esta jurisdicción, fue resuelto hace más de un siglo por la Corte Suprema de los Estados Unidos por voz del Juez Story en el caso *The Caledonian*, 4 Wheat 99 (U.S. 1819) 4 L.Ed. 523, en el cual se dijo que tanto bajo el derecho marítimo como por la ley común general, cualquier persona puede ocupar (*seize*) cualquier propiedad sujeta a confiscación; que si el gobierno procede a confiscarla, ese solo hecho convalida el registro y la ocupación aunque éstos hubieran sido ilegales y que dicha confirmación tiene efecto retroactivo, es decir, equivale a que el registro y ocupación se hubiesen hecho en cumplimiento de una orden legal."

El caso siguiente es el de *General Motors Acceptance Corporation* v. *Tribunal de Distrito*, 70 D.P.R. 941 (Marrero) (1950), cita precisa a las págs. 943–945; (en reconsideración) 70 D.P.R. 945 (1950), cita precisa a las págs. 946–948. En la declaración jurada de un procedimiento de reclamación y entrega de bienes muebles vendidos bajo contrato de venta condicional, la General Motors Acceptance Corporation solicitó la reposesión de un automóvil que había sido ocupado por El Pueblo de Puerto Rico al transportarse en dicho automóvil material e implementos utilizados en relación con los juegos prohibidos de la bolita. La Sala de primera instancia

permitió la intervención de El Pueblo de Puerto Rico y además declaró no haber lugar a la reposesión.

La ley aplicada fue la Sec. 5 de la Ley Núm. 220 de 15 de mayo de 1948 (págs. 739, 743) que disponía: "Todos los artefactos, vehículos u otros medios de transportación, monedas y demás enseres e implementos ocupados y utilizados en relación con los juegos prohibidos de la 'Bolita', 'Bolipool' combinaciones clandestinas en relación con los 'pools' o bancas de los hipódromos de Puerto Rico y lotería clandestinas que hayan sido ocupados en relación con dichos juegos, serán confiscados en favor de El Pueblo de Puerto Rico y vendidos por orden de la Corte o Tribunal correspondiente a través del marshal de la misma en pública subasta, al mejor postor . . . ."

Resolviendo sobre los alegados errores de la Sala de primera instancia, este Tribunal tomando razón del caso de *General Motors Acceptance* v. *Brañuela,* declaró: "el procedimiento de confiscación va dirigido contra el vehículo mismo y no contra sus dueños y . . . por consiguiente, los derechos que sobre el vehículo puedan tener terceros inocentes no están protegidos, excepto en aquellos casos en que se demuestre que la posesión del vehículo ha sido obtenida por el infractor sin el consentimiento expreso o implícito del dueño o del tercero inocente como sucede cuando el vehículo ha sido hurtado . . . . Se exige siempre en casos de confiscación que el dueño del vehículo sea notificado del procedimiento y tenga la oportunidad de ser oído . . . . En el presente la sección 5 de la Ley 220, supra, no dice de manera específica cual es el procedimiento que debe seguirse para la confiscación, ni si ha de hacerse notificación a persona alguna o darse a ésta oportunidad de ser oída. Lo primordial que el estatuto exige es que se pruebe que el vehículo era utilizado en relación con los juegos prohibidos de la bolita o bolipool. Empero, para lograr esto, la notificación del procedimiento y la oportunidad de ser oídas las tienen siempre las partes bajo

nuestra ley, ya que en armonía con lo provisto por el artículo 107 del Código de Enjuiciamiento Criminal: 'El Fiscal entablará, dentro de su distrito, todos los procesos por . . . confiscaciones en nombre del Pueblo de Puerto Rico'. En esos procedimientos de confiscación tanto la persona en posesión del vehículo al tiempo de la incautación como cualesquiera otras que tengan interés en éste, necesariamente han de ser notificadas y oídas. La sección 5 de la Ley 220 y el artículo 107, supra, por ser *in pari* materia han de ser interpretados sin duda conjuntamente. Artículo 18 del Código Civil ed. 1930. A virtud de la intervención solicitada por El Pueblo en el procedimiento de reposesión la aquí peticionaria ha tenido ya conocimiento de que el vehículo vendido en venta condicional por su cedente la Caribe Motors, ha sido incautado (seized) por El Pueblo y está sujeto a un procedimiento de confiscación. Cuando luego de finalizada la causa criminal el fiscal, a tenor con el artículo 107, supra, entable un procedimiento para la confiscación del vehículo, ella como parte interesada tendrá la oportunidad de ser oída en relación con cualesquiera derechos que alegue tener sobre el mismo."

En cuanto a la reconsideración se reafirma la aseveración anterior de que: "El procedimiento se iniciará tan pronto finalice la causa criminal ante la corte que conoce originalmente de la misma, sin esperar el resultado final de la apelación que pueda interponerse y se presentará ante la Corte con jurisdicción competente por razón de la cuantía . . . ."

El siguiente caso es el de *Sánchez* v. *Tesorero*, 72 D.P.R. 133 (De Jesús) (1951), cita precisa a las págs. 134-135. El dueño de un automóvil público asegurado, en una ocasión en que se dirigía de Cordillera a Ciales tomó un pasajero que traía varios paquetes, indicándole a dicho pasajero que pusiera los paquetes en el piso del automóvil en el sitio en que descansen los pies de los pasajeros que ocupan el asiento trasero. Poco después la policía mandó a parar el automóvil y al

registrar los paquetes que había traído el pasajero, encontró que contenían ron cañita sin que se hubiesen satisfecho los correspondientes arbitrios.

La ley aplicada fue el Art. 62 de la Ley Núm. 6 de 1936, según enmendado por la Ley Núm. 244 de 12 de mayo de 1945 que disponía: "El Tesorero queda por la presente autorizado para confiscar cualquier vehículo, bote, lancha de motor, caballo o bestia o cualquier embarcación marítima o aérea que se capture cargado, o en el momento de cargar o descargar o de estar transportando, llevando o trasladando espíritus destilados o bebidas alcohólicas fabricados, importados, destilados o rectificados ilegalmente y sobre los cuales no se hubieren pagado los impuestos prescritos por esta Ley; y los mismos serán vendidos en pública subasta para beneficio de El Pueblo de Puerto Rico; Disponiéndose, que el Tesorero, a su discreción, y si el servicio público así lo requiere, podrá designar aquellos vehículos, botes, lanchas de motor, caballos, que estimare necesarios para uso oficial de los funcionarios o empleados debidamente autorizados del Departamento de Hacienda."

El Tesorero ordenó la confiscación del vehículo y el dueño del mismo instó un pleito en la corte de anterior instancia solicitando que se anulase la confiscación decretada por el Tesorero; y dicha corte, luego de un juicio en sus méritos, declaró con lugar la demanda y en su consecuencia decretó la devolución del vehículo por no haber tenido el dueño y conductor del vehículo, conocimiento ni participación en el transporte del licor. La decisión de la anterior instancia fue confirmada por este Tribunal porque: "el procedimiento de confiscación a que se refiere el artículo 62 antes citado, va dirigido contra el vehículo en si y no contra su dueño o las personas que puedan tener algún derecho sobre el mismo; que los derechos del dueño y de los terceros interesados no están protegidos contra la confiscación, excepto en aquellos casos en que se demuestre que la posesión del vehículo fue

obtenida por el infractor de la ley sin el conocimiento expreso o implícito del dueño o tercero interesado. En otras palabras que si el dueño o tercero interesado directa o indirectamente han puesto el vehículo en la posesión del infractor, los derechos de aquellos, aunque personalmente fueren inocentes de la infracción, corren la suerte del uso a que el vehículo pueda ser dedicado por la persona a quien le fue confiado. A *contrario sensu*, si la persona a cargo del vehículo es inocente de la infracción cometida, no procede la confiscación en perjuicio del dueño o tercero reclamante inocente . . . . No obstante la diferencia entre los hechos del presente caso y el de *General Motors Acceptance* v. *Brañuela*, supra, la doctrina establecida en este último, nos da la luz necesaria para la solución del problema que ahora nos ocupa. Es claro, a nuestro juicio, que si la confiscación no procede cuando la persona a cargo del vehículo ni el reclamante tienen conocimiento ni motivos para conocer el uso ilegal para el cual se utilizó el vehículo, tampoco debe proceder la confiscación cuando la persona a cargo del vehículo es el propio dueño quien es inocente de la infracción como sucede en el presente caso. Parece conveniente consignar que la culpabilidad o inocencia de la persona a cargo del automóvil, es una cuestión de hecho que debe surgir de la evidencia . . . ."

El caso que sigue, relacionado con la legalidad de las confiscaciones, es el caso de *Metro Taxicabs* v. *Tesorero*, 73 D.P.R. 171 (Negrón Fernández) (1952), cita precisa a las págs. 180–181. Ciertos agentes de rentas internas sorprendieron un taxi de la Metro Taxicabs, Inc., transportando bebidas alcohólicas sobre los cuales no se habían pagado los correspondientes derechos de rentas internas. El Tesorero de Puerto Rico procedió a confiscar dicho vehículo a tenor con las disposiciones del Art. 62 de la Ley Núm. 6 de 30 de junio de 1936, según quedó enmendado por la Ley Núm. 244 de 12 de mayo de 1945, antes acotada. La corte de anterior instan-

cia revocó la decisión del Tesorero y ordenó la devolución y
entrega del vehículo a la Metro Taxicabs, Inc. Este Tribunal
revocó por haber concluido que [eran erróneos] los dos su-
puestos de los hechos probados que sirvieron de base al ilus-
trado Juez de anterior instancia para ordenar la devolu-
ción, a saber, (1) que se trataba de un hurto de uso del
vehículo toda vez que la persona encargada del mismo en el
momento de la confiscación entró en su posesión por medio
de engaño o artificio sin conocimiento ni autorización de la
demandante apelada y (2) al llegar a la conclusión implícita
que la Metro Taxicabs, Inc., era un tercero inocente. Este
Tribunal, al resolver sobre los dos supuestos de hecho, hizo
el siguiente análisis de la prueba:

"Ante estos hechos, fácil es advertir que la conclusión del
tribunal inferior, en el sentido, de que 'Prácticamente lo que
hubo en este caso fue [un] hurto de uso del taxímetro'—luego
de expresar que 'Como cuestión de hecho, por tanto, el uso a la
posesión del taxímetro por parte de Angel Gómez fueron ilegales
y no autorizados'—es errónea. El vehículo estaba en posesión de
Alicea, empleado de la demandante y Gómez vino en posesión
del mismo por autorización de Alicea, quien se lo entregó a
Gómez para que fuera a 'buscar un viaje'. Haciendo caso omiso
ahora de la explicación que Alicea dio a la gerente-tesorera de
la empresa en cuanto a lo ocurrido, véase nota 4, la declaración
del propio Alicea revela que al regresar Gómez con el 'contra-
bando' dentro del automóvil al sitio en que se había quedado
tomando café y les esperaba, Alicea subió al mismo 'porque
tenía que ir a entregar el carro', no obstante haber advertido que
el automóvil venía 'lleno de ron'. Aunque a la pregunta del juez
inferior de 'usted protestó o no protestó' 'contestó', 'sí' no dijo,
sin embargo, en que había consistido su protesta ni como la
había manifestado. Por el contrario, su propio testimonio es
revelador de su consentimiento—ya conocida la existencia 'del
contrabando' en el automóvil—a que Gómez continuara en la
posesión y control del mismo de ahí en adelante, permitiendo
que se le utilizara en la transportación de ron clandestino . . . .

"De acuerdo con la declaración de Alicea—que es en la que
basa exclusivamente sus conclusiones de hecho el Juez inferior—

y sin entrar a considerar otros extremos que surgen del resto de la propia prueba de la demandante, es evidente que se trata en este caso, a lo sumo, del uso no autorizado de un vehículo por el empleado a quien le fue confiado, quien lo entregó a, y consintió y permitió que otra persona lo usara ilegalmente. Esa circunstancia, sin embargo, no protege a la demandante. En tal situación es de clara aplicación la regla expuesta en el caso de *General Motors Acceptance* v. *Brañuela*, 61 DPR 725, en el sentido de que 'si el dueño o tercero interesado directa o indirectamente ha puesto el vehículo en posesión del infractor, o de la persona bajo la cual actúa éste, los derechos del dueño o tercero interesado en tales circunstancias corren la suerte del uso a que el poseedor puede someter el vehículo.'"

El caso, próximo en la discusión, es el de *Stuckert Motor Co.* v. *Tribunal de Distrito*, 74 D.P.R. 527 (1953) (Snyder), cita precisa a las págs. 530–533 que se refiere a una demanda radicada en la corte de anterior instancia por Stuckert Motor Company contra el Pueblo de Puerto Rico por la confiscación de un automóvil Studebaker, propiedad de la corporación, por una violación del Art. 37 de la Ley Núm. 17 de 19 de enero de 1951, según enmendado por la Ley Núm. 397 de 10 de mayo de 1951, en el sentido, que "Cuando un policía insular o funcionario de orden público sorprendiere a cualquier persona en el acto de transportar en cualquier montura o vehículo cualquier arma en violación a la presente Ley, será deber de tal funcionario incautarse de toda arma así encontrada y transportada en violación a la Ley. Cuando tales armas transportadas o poseídas ilegalmente sean ocupadas por un oficial de orden público, dicho funcionario tomará posesión de la montura o vehículo y deberá arrestar a la persona a cargo del mismo para que responda por el delito cometido.

"El Procurador General queda por la presente autorizado para confiscar cualquier montura o vehículo así ocupado y venderlo en pública subasta para beneficio de El Pueblo de Puerto Rico. El procedimiento para la confiscación de toda propiedad bajo las disposiciones de este artículo se seguirá

ante la sección del Tribunal de Distrito de Puerto Rico a la cual le correspondiere entender en el proceso criminal, sea originalmente o en grado de apelación, y se iniciará mediante la ocupación por el Procurador General de la propiedad objeto de la confiscación. Los dueños de la propiedad así ocupada, los que estén a cargo de ella y los que tengan algún derecho o interés conocido en la misma, serán notificados por correo si su dirección fuere conocida y podrán impugnar la confiscación dentro de los (15) días siguientes a la fecha de la notificación, mediante demanda contra El Pueblo de Puerto Rico, sin prestación de fianza, que se notificará al Procurador General, debiendo éste formular sus alegaciones dentro de los diez días (10) siguientes a la notificación. El juicio se celebrará sin sujeción a calendario y contra la sentencia que recaiga no habrá otro recurso que el de certiorari para ante el Tribunal Supremo, limitado a cuestiones de derecho. La notificación por correo a los dueños, encargados y otras personas con algún derecho o interés conocido en la propiedad ocupada se entenderá perfeccionada con el mero depósito de la misma en el correo."

En el caso se suscitó la posible similitud, en contenido jurídico, de nuestro Art. 37 con el Art. 26 de la Ley Nacional de Prohibición que disponía:

"Art. 26—Cuando el Comisionado, sus ayudantes, inspectores, o cualquier oficial de la ley descubra a cualquier persona en el acto de transportar en violación de la ley, bebidas embriagantes en cualquier vagón, coche, automóvil, embarcación aérea o marítima, u otro vehículo, será su deber ocupar cualquiera y todas las bebidas embriagantes encontradas allí y que estén siendo transportadas contrario a la ley. Siempre que sean ocupadas por un oficial bebidas embriagantes ilegalmente poseídas o transportadas dicho oficial tomará posesión del vehículo tiro de carga o automóvil, bote, embarcación aérea o marítima, o cualquier otro medio de transporte, y arrestará a cualquier persona a cargo de los mismos. Dicho oficial procederá de inmediato contra la persona arrestada, bajo las disposiciones de este capítulo en

cualquier corte de jurisdicción competente, pero dicho vehículo o medio de transporte será devuelto a su dueño, previa prestación de fianza válida y con garantías suficientes, por una suma doble del valor de la propiedad, dicha fianza será aprobada por dicho oficial y será condicionada a la devolución de la custodia de dicha propiedad a dicho oficial en el día del juicio para cumplir con la sentencia de la corte. Al ser convicta la persona así arrestada la corte ordenará la destrucción de las bebidas ocupadas, y a menos que el dueño demuestre justa causa al contrario, ordenará la venta en pública subasta de la propiedad ocupada, y el oficial encargado de la subasta, después de deducir los gastos de la custodia de la propiedad, los derechos de la ocupación, y costas de la venta, pagará todos los gravámenes, de acuerdo a sus prioridades, que sean establecidos, mediante intervención o de otra manera en dicha vista o en otro procedimiento instado con tal propósito, y que demuestre sean verdaderos y creados sin que el dueño del gravamen tuviese conocimiento de que el vehículo fuese usado o iba a ser usado para el transporte ilegal de bebidas alcohólicas, el balance del producto de la subasta ingresará al Tesoro de los Estados Unidos como ingresos misceláneos. Todo gravamen contra propiedad vendida bajo las disposiciones de esta sección será transferido de la propiedad al producto de la venta de dicha propiedad. Si no apareciere nadie reclamando el tiro de carga, vehículo, embarcación aérea o marítima, o automóvil, la ocupación de la misma con su descripción, será anunciada en algún periódico publicado en la ciudad o condado donde fue ocupada y si en la ciudad o condado no fuese publicado periódico alguno, en un periódico que tuviere circulación en el condado, por dos semanas una vez por semana, y por hojas sueltas fijadas en tres sitios públicos cerca del lugar de la ocupación, y si ningún reclamante apareciere dentro de los diez días después de la última publicación del anuncio, la propiedad será vendida y el producto de la venta después de deducidos los gastos y costas ingresará en el Tesoro de los Estados Unidos como ingresos misceláneos,"

resolviendo este Tribunal que "No empece la similitud en lenguaje entre el artículo 26 de la Ley Nacional de Prohibición y el artículo 37 de nuestra Ley de Armas, no creemos que los casos resueltos bajo la primera controlan el asunto que pende

ahora ante nos. En primer lugar, toda vez que la Ley de Prohibición presentaba muchos problemas peculiares, los casos resueltos bajo la misma frecuentemente no son de aplicación en otros [*sic*] campos. En segundo lugar, las cortes federales tenían constantemente ante sí durante la época de la prohibición el difícil problema de si el procedimiento para la confiscación de un vehículo caía bajo las leyes contributivas o bajo el artículo 26 de la Ley de Prohibición. Esto era importante ya que la primera no protegía, como lo hacía el artículo 26, los intereses de terceros o dueños inocentes . . . . Por tanto el gobierno usualmente alegaba—a veces con éxito —que no se aprehenda a ninguna persona en el acto de transportar bebidas embriagantes en un vehículo, con el fin de instar la acción bajo las leyes contributivas en vez de bajo la Ley de Prohibición en perjuicio de dueños o terceros inocentes. Pero aquí tenemos un estatuto estadual en donde no hay que hacer tal elección, en el campo distinto de poner en ejecución la Ley de Armas."

Sobre todo aspecto relacionado con el alcance o ilegalidad de las confiscaciones, el próximo caso resulta ser el de *Downs* v. *Porrata, Fiscal*, 76 D.P.R. 611 (Belaval) (1954), cita precisa a las págs. 617 (*in fine*) 619. Se presentó por el fiscal del anterior Tribunal de Distrito de Puerto Rico, sección de Arecibo, una acusación contra el Sr. Robert H. Downs, miembro de las Fuerzas Armadas de los Estados Unidos, por infracciones a los Arts. 7 y 29 de la Ley Núm. 17 de 19 de enero de 1951, anteriormente acotada, y al ser arrestado se le ocupó una motocicleta de su propiedad, presuntivamente utilizada para la transportación ilegal del arma prohibida. El Honorable Gobernador de Puerto Rico le concedió un indulto al infractor y éste solicitó la devolución de la motocicleta. La única cuestión sometida en el recurso de última instancia era determinar el efecto de un indulto total, pleno e incondicional sobre cualesquiera propiedades ocupadas o

confiscadas por haber sido utilizadas en la comisión del delito.

El fiscal solicitó de este Tribunal que aplicáramos al caso, la teoría de la culpabilidad sobre la cosa, y resolviéramos, que siendo el procedimiento de confiscación uno *in rem*, dirigido contra el vehículo mismo y no contra su dueño, cualquier indulto concedido al dueño no alcanzaba la cosa. Este Tribunal resolvió en contra de la petición del fiscal, por los siguientes fundamentos:

"La algunas veces útil ficción que la culpabilidad puede recaer sobre la cosa que sirve de instrumento para la comisión de un delito, haciendo abstracción de la voluntad criminal que la dirige, no tiene un valor absoluto del cual deba hacerse depender la resolución de este caso. La naturaleza *in rem* o *in personam* de un procedimiento depende en cuanto a su valoridad de lo que persiga el estatuto. Algunas veces una ley, como sucede con el art. 34 de la Ley de Armas de Puerto Rico, según quedó enmendado por la Ley núm. 129 de 22 de abril de 1952 . . . declara como estorbo público ciertos instrumentos, que por su extrema peligrosidad para el Estado, tan pronto son ocupados, quedan ministerialmente confiscados, para su posible uso legal por el Estado o para su destrucción definitiva. Otras veces, como sucede con el art. 37 de la misma ley, según quedó enmendado por la Ley núm. 397 de 10 de mayo de 1951, se ordena una simple incautación de ciertos instrumentos, que a pesar de ser utilizables para fines lícitos, se convierten en instrumentos ilícitos por el uso que le ha dado el delincuente. En el primer caso, la confiscación es automática y el título (de propiedad) pasa directamente al Estado, y la declaración judicial de culpabilidad acarrea automáticamente el decomiso de la cosa, sin tomar en consideración ningunos otros intereses que no sean los del Estado mismo. En el segundo caso, la confiscación tiene que hacerse mediante declaración judicial, después que se pruebe (1)

el uso ilegal de la cosa y (2) el conocimiento de los interesados de dicho uso ilegal. El título de propiedad no pasa al Estado ni a la persona que lo adquiera en la venta judicial, hasta que no medie declaración judicial y el procedimiento de subasta se haya cumplido. No es la naturaleza de la acción, sino el propósito del estatuto, lo que nos debe guiar en una situación como ésta . . . ."

Continúa la opinión del caso de *Downs*: "No estamos en este caso frente a la cosa de extrema peligrosidad que haya sido legislativamente declarada estorbo público. En este [*sic*] [ese] caso nos inclinamos a pensar con el demandado que el indulto no cubriría la remisión de propiedad que pudiera resultar lesiva para el Estado. Pero cuando se trata, como se trata en este caso, de una propiedad útil, aprovechable para fines lícitos, como suelen ser los vehículos y monturas, donde incluso la ley reconoce el derecho de las personas inocentes a reclamar la cosa, el efecto práctico del indulto es, que al borrarse todo vestigio de culpabilidad de la persona, la propiedad confiscada se convierte automáticamente en una propiedad inocente . . . que puede revertir a su dueño, puesto que es la culpa del dueño la que la convierte en un instrumento o medio ilícito para la comisión de un delito."

Otro caso que está comprendido en este estudio, es el de *Estado Libre Asociado* v. *Tribunal Superior*, 76 D.P.R. 842 (Negrón Fernández) (1954), cita precisa a las págs. 844–846. Los hechos que dieron motivo de la confiscación fueron los siguientes: La señora Elsie Torres era dueña de un automóvil licencia P.49-530, dedicado a la transportación de pasajeros mediante paga, guiado por el empleado de la señora Torres, Adam Colón. La noche de la incautación, el referido chófer se dirigía al Bar Sinaloa, ubicado en la carretera de Maragüez, barrio de Ponce, con el objeto de transportar hasta Ponce, mediante paga a Humberto Zengotita, dueño del referido Bar. En el trayecto hacia el mencionado establecimiento surgió una discusión entre el chófer Adam Colón y varios de

los pasajeros que conducía, nombrados Jesús Feliciano, Montero y Carlos Villanueva. El chófer, con el propósito de evitar una desgracia, despojó a Feliciano Montero de un revólver que éste portaba ilegalmente, reteniendo el arma por algunos minutos, la cual, sin embargo, ante su insistencia, devolvió a Feliciano. A la una de la madrugada se dirigían a Ponce, Humberto Zengotita, así como Feliciano, Villanueva, dos mujeres no identificadas, en el mismo carro, conducido por Adam Colón, propiedad de la señora Elsie Torres. En el trayecto surgió otra discusión, esta vez entre Villanueva y el chófer Colón. A instancias de Villanueva, Colón detuvo la marcha. Bajaron Villanueva y el chófer insistiendo el chófer Colón en pelear con Villanueva. En ese instante, ante una señal de Villanueva, se detuvo un automóvil bajando del mismo el Cabo Pierantoni, de la Policía. Registró al chófer Colón sin que le encontrara arma de fuego alguna, pero al observar que Feliciano sacaba de su seno un revólver y lo ponía en el asiento delantero del automóvil, ocupó el arma. El juez sentenciador concluyó que el chófer Adam Colón no fue sorprendido por el Cabo Pierantoni en el acto de *transportar* en el vehículo un arma de fuego y que por lo tanto no procedía la confiscación; que él era inocente de la infración de ley cometida al encontrarse un arma en el vehículo que conducía; que si hubo posesión de su parte la misma fue incidental, en evitación de una tragedia, y que como el automóvil era uno dedicado al servicio público cuando se ocupó el arma, no había presunción de posesión ilegal de la misma por parte de las demás personas en el vehículo, según el Art. 14 de la Ley de Armas.

La ley aplicada por la corte de anterior instancia, según se ve, fue la Sec. 14 de la Ley Núm. 17 de 19 de enero de 1951 (Leyes de 1950-51 pág. 427), según enmendada por la Ley Núm. 397 de 10 de mayo de 1951 ( (1) pág. 993) que disponía: "La presencia en un vehículo de cualquiera de las armas, instrumentos o accesorios especificados en los arts. 4, 5,

6, 9 y 10 de esta Ley será evidencia *prima facie* de su posesión ilegal por todas las personas que se encuentren en dicho vehículo al momento en que se hallaren tales armas, instrumentos o accesorios *salvo que se tratare de un vehículo de servicio público que en ese momento estuviere transportando pasajeros mediante paga.* Cuando una de las personas que se encuentren en dicho vehículo sea la que porte en su persona dicha arma, instrumento o accesorio y dicha persona lleve consigo una licencia válida para portar el arma, instrumento o accesorio así hallado, y no estuviere allí bajo amenaza, la presunción de posesión ilegal no cubrirá a las otras personas que se encuentren en dicho vehículo. Nada de lo contenido en este artículo será aplicable a los funcionarios públicos, policías, soldados o personas autorizadas por esta Ley para portar armas por razón de su cargo."

El Tribunal revocó la decisión de la corte de anterior instancia por los siguientes fundamentos: "Si bien el chófer Colón no tenía sobre su persona el revólver cuando éste fue ocupado por el Cabo Pierantoni, es lo cierto que su conocimiento de que Feliciano portaba ilegalmente un arma lo convirtió en un copartícipe del hecho ilegal de su transportación. La excepción contenida en el art. 14 es para beneficio de aquellas personas que, al utilizar un vehículo de transportación pública, ignoran el hecho de que en el mismo se transporta por alguien, ilegalmente, un arma prohibida. Pero dicha excepción sólo los saca de la regla de evidencia *prima facie*—que no estamos aquí considerando—para los fines de un proceso criminal en su contra. Aquí se trata de un procedimiento dirigido contra el vehículo que sirve de medio para la transportación ilegal del arma . . . . La confiscación de un vehículo usado en la transportación de un arma de fuego bajo el art. 37 de la Ley es una acción *in rem*, dirigida contra el vehículo mismo y no contra el dueño o quien lo represente: (citas) El hecho de que el chófer del vehículo no portara sobre su persona o transportara con fines propios el revólver

no es defensa contra la confiscación del medio usado para la transportación."

El penúltimo caso que debemos considerar es el de *Ochoteco* v. *Tribunal Superior*, 88 D.P.R. 517 (Santana Becerra) (1963), cita precisa a las págs. 518–519. Los hechos estipulados demuestran que el día 3 de febrero de 1961, entre las diez y media y once de la noche, en la Avenida Ponce de León de Santurce, miembros del cuerpo de la Policía Estatal procedieron a la ocupación y confiscación de un automóvil propiedad del demandante Carlos M. Ochoteco porque en el citado día y mientras el automóvil era ocupado por Daniel Domingo Nuñez Mójica, quien lo guiaba, y Jesús Negrón Machuca, Reinaldo Pagán García y José González Rodríguez, fueron ocupados dentro del vehículo, y no sobre ninguna de las personas antes dichas, un revólver Colt, calibre 38, inscrito a nombre de Ramón Quiñones López, quien había informado a la Detective que el mismo se le había desaparecido de su residencia y una pistola que se ignoraba a favor de quien aparecía inscrita. De la estipulación de hechos aparece que como a las cinco de la tarde del mismo 3 de febrero de 1961, el demandante Carlos M. Ochoteco le ordenó al chófer Daniel Domingo Nuñez Mójica, quien era empleado del demandante Ochoteco en su negocio de ventas de persianas, puertas y cortinas de Cataño, Puerto Rico, para que procediera a cargar el vehículo, como lo cargó, con persianas destinadas a ser usadas en una casa que se hallaba edificando el Sr. Rafael Torrech Ríos en el barrio Juan Sánchez, de Bayamón; que el demandante Carlos M. Ochoteco le dio expresas instrucciones a su empleado a los efectos de utilizar exclusivamente dicho vehículo para trasladarse el empleado a su residencia en el Barrio Pueblo Viejo de Guaynabo, y una vez en su mencionada residencia, no utilizara el vehículo en cuestión hasta temprano en la mañana del sábado 4, 1961 en que debía llevar, descargar y entregar las persianas en la referida casa en construcción de don Rafael Torrech Ríos; que al llegar

a su residencia en el Barrio Pueblo Viejo el chófer Daniel Domingo Nuñez Mójica, procedió a descargar las persianas e invitó a Jesús Negrón Machuca, Reinaldo Pagán García y José González Rodríguez a irse de fiesta o parranda, como se fueron, acompañados de rameras y estando en varios sitios de diversión tomando bebidas embriagantes y bailando; que mientras se hallaban divirtiéndose en la forma antes dicha en el día hora y sitios indicados fueron detenidos por una supuesta infracción a la Ley de Tránsito, ocupándose las dos armas antes mencionadas y siendo arrestados sus aludidos ocupantes, no encontrándose entre estos en momento alguno el aquí demandante, ni el citado cargamento.

La corte de anterior instancia, concluyó como cuestión de derecho para negar la devolución del automóvil por ser ilegal su confiscación, que: "Si bien el planteamiento del demandante está saturado de lógica, sin embargo de conformidad con el estado de la jurisprudencia en nuestra jurisdicción, todo procedimiento de confiscación de un vehículo por ir dirigido contra éste, y no contra su dueño, es uno 'in rem,' por lo que, los derechos de terceros inocentes, ni están envueltos ni están protegidos.", citando los casos de *General Motors Acceptance* v. *Brañuela* (en reconsideración), *General Motors Acceptance* v. *Tribunal de Distrito*, *Stuckert Motor* v. *Tribunal de Distrito*, *Downs* v. *Porrata*, anteriormente acotados. ..

Este penúltimo caso tiene un análisis de nuestra jurisprudencia de gran escrupulosidad y mesura, con ánimo de demostrar que nuestra jurisprudencia ha tratado de proteger los derechos de los terceros inocentes. Veamos como se expresó el ilustrado Juez ponente sobre el particular: "A la luz de nuestras decisiones aun cuando hayan seguido un criterio restrictivo en favor de la confiscación, no podemos convenir con la Sala sentenciadora en que situaciones como éstas tiene por única contestación el hecho de que la acción va dirigida a la cosa *res* por lo que los derechos de terceros inocen-

tes, ni están envueltos ni están protegidos. Una generalización así de la norma de derecho aplicable no es en todos los casos procedente. Cada caso debe verse y pesarse a la luz de sus hechos, ya que la naturaleza *in rem* de la acción no la desviste de su condición esencialmente punitiva y de infligir castigo. Es claro el principio aquí vigente que en manera alguna desvirtuamos, que aquel que cede o entrega la posesión de un vehículo de ordinario asume el riesgo del uso ilegal que pudiera dársele al mismo. Pero no toda entrega de la posesión de un vehículo tiene iguales motivaciones, ni idéntica justificación, ni la misma necesidad, ni similares propósitos. Este caso debe resolverse por sus particularísimos hechos. Según los estipulados, se trata de una posesión que ocurrió por la necesidad de un negocio."

El último caso de nuestra jurisprudencia que acotaremos es el caso de *Meléndez* v. *Tribunal Superior*, 90 D.P.R. 656 (Ramírez Bages) (Negrón Fernández) (Belaval—Hernández Matos—Santana Becerra) (Blanco Lugo—Pérez Pimentel—Rigau—Dávila y Ramírez Bages) (1964), cita precisa a las págs. 664–665.

De acuerdo con las conclusiones de hecho del juez de anterior instancia, Juan R. Meléndez vendió en venta condicional a Carlos M. Ortiz un vehículo de motor Chevrolet, que al 27 de junio de 1962 no había sido pagado en su totalidad; que en esa fecha y mientras dicho vehículo de motor era conducido por Anastasio Cintrón Torres yendo también dentro el comprador condicional Carlos M. Ortiz, ocurrió un accidente en el cual estuvo envuelto dicho vehículo de motor y al intervenir la policía, ocupó dentro de dicho vehículo un instrumento, descrito en el informe policiaco como una cachiporra. Al solicitar el vendedor condicional la devolución del vehículo para cobrar de él los plazos no pagados de su venta condicional, la Corte de anterior instancia concluyó, que siendo el instrumento ocupado similar a una cachiporra, el mismo era un arma prohibida y su ocupación dentro de dicho vehículo

conllevaba la confiscación del vehículo, denegando la devolución solicitada.

Las leyes aplicables a la legalidad de la confiscación en este caso son las siguientes: El Art. 37 de la Ley Núm. 17 de 19 de enero de 1951, según enmendada por la Ley Núm. 39 de 4 de junio de 1960, dispone que: "El Secretario de Justicia confiscará cualquier vehículo, bestia o embarcación marítima o aérea en que se cargue, descargue, transporte, lleve o traslade; que se use para cargar, descargar, transportar llevar o trasladar; o que se sorprenda cargado o en el momento de cargar, o descargar, o de estar transportando, llevando o trasladando, cualquier arma en violación de esta ley. Para la confiscación y disposición de vehículos, bestias y embarcaciones marítimas o aéreas se seguirá el procedimiento establecido por la ley conocida como Ley Uniforme de Confiscación de Vehículos Bestias y Embarcaciones." y el Art. 2 de la Ley Núm. 39 de 4 de junio de 1960, según enmendado por la Ley Núm. 10 de 1ro. de septiembre de 1961 que dispone:

"Artículo 2.—Cuando un vehículo, bestia o cualquier embarcación marítima o aérea fuere confiscado en virtud de lo dispuesto por la Ley núm. 6, de 30 de junio de 1936, la Ley núm. 220, de 15 de mayo de 1948, la Ley núm. 17, de 19 de enero de 1951, la Ley núm. 48, de 18 de junio de 1959 y/o la Ley núm. 2, de 20 de enero de 1956, la confiscación se tramitará en la siguiente forma:

(a) El procedimiento se iniciará mediante la ocupación de la propiedad por el Secretario de Justicia, el Secretario de Hacienda, o el Superintendente de la Policía, por conducto de sus delegados, policías o agentes de orden público. El funcionario bajo cuya autoridad se actúe notificará al dueño, encargado o persona con derecho o interés conocido en la propiedad ocupada, de la ocupación y tasación de los bienes ocupados; debiendo efectuarse la notificación en forma fehaciente, dentro de los diez (10) días siguientes a la ocupación; entendiéndose perfeccionada la notificación mediante su envío por correo con acuse de recibo. Los dueños, encargados, o interesados en los bienes ocupados

podrán impugnar la confiscación dentro de los quince (15) días siguientes a la fecha de la notificación, mediante demanda contra el funcionario bajo cuya autoridad se haya efectuado la confiscación, a quien se notificará y quien deberá formular sus alegaciones dentro de los diez (10) días siguientes a la notificación. La demanda deberá radicarse en la Sala del Tribunal Superior de Puerto Rico, correspondiente al lugar donde se efectuó la ocupación, y el juicio se celebrará sin sujeción a calendario. Las cuestiones que se susciten deberán resolverse, y los demás procedimientos tramitarse de la misma manera que si se tratase de una acción civil ordinaria. Contra la sentencia que recaiga no habrá otro recurso que el de Certiorari para el Tribunal Supremo, limitado a cuestiones de derecho. La radicación de la demanda de impugnación dentro del término aquí establecido se considerará requisito jurisdiccional previo para el ejercicio de la acción aquí autorizada.

(b) Todo vehículo, bestia o cualquier embarcación marítima o aérea confiscado, será tasado al tomarse posesión del mismo por el funcionario bajo cuya autoridad se efectuó la confiscación, o por su delegado, excepción hecha de los vehículos de motor los cuales serán puestos bajo la custodia de la Oficina de Transporte del Estado Libre Asociado de Puerto Rico, la cual tasará los mismos inmediatamente después que los reciba.

En caso de impugnación judicial de la confiscación, el Tribunal, a petición de la parte actora, y previa audiencia de las partes, determinará la razonabilidad de la tasación como un incidente del pleito de impugnación.

Dentro de los diez (10) días de haberse radicado la demanda de impugnación, la parte actora tendrá derecho a prestar una garantía a favor del Estado Libre Asociado de Puerto Rico y ante el Secretario del Tribunal correspondiente, a satisfacción del Tribunal, por el importe de la tasación de la propiedad ocupada, la cual garantía podrá ser en moneda legal, cheques certificados, obligaciones hipotecarias o por compañías de seguro. Aprobada la garantía, el Tribunal ordenará que las propiedades sean entregadas a su dueño. En tal caso, no se aplicarán las disposiciones de los incisos (c), (d) y (e) que siguen.

Cuando se admita la garantía no se permitirá la posterior sustitución de las propiedades embargadas en lugar de la garantía, la cual responderá por la confiscación si la legalidad de ésta

fuera sostenida; debiendo el Tribunal, en la resolución que dicte a estos efectos, disponer sobre la ejecución sumaria de dicha garantía por el Secretario del Tribunal y su ingreso en los fondos generales del Gobierno de Puerto Rico, en el caso de que sea en moneda legal o en cheques certificados; las obligaciones hipotecarias o de compañías de seguro serán remitidas por el Secretario del Tribunal correspondiente al Secretario de Justicia para el trámite de su ejecución.

(c) Transcurridos quince (15) días desde la notificación de la ocupación sin que la persona o personas con interés en la propiedad confiscada haya radicado la correspondiente demanda de impugnación, o transcurridos veinticinco (25) días, desde la notificación de la ocupación sin que el Tribunal haya ordenado la devolución de los bienes ocupados por haberse prestado garantía a tal efecto, el funcionario bajo cuya autoridad se llevó a cabo la confiscación, el delegado de éste, o la Oficina de Transporte, según sea el caso, podrá disponer para la venta en pública subasta de la propiedad confiscada o la destinará para el uso oficial del Gobierno de Puerto Rico. En caso de no poder ser vendida en pública subasta, o no poder ser dedicada a uso oficial del Gobierno, la propiedad podrá ser destruida por el funcionario a su cargo, haciendo constar en un acta, que a dicho fin levantará, la descripción de la propiedad, los motivos para su destrucción, y la fecha y lugar en que se efectúa; debiendo notificar con copia de dicha acta al Secretario de Justicia.

(d) De venderse en pública subasta el vehículo, bestia o embarcación marítima o aérea, el importe de la venta ingresará al fondo general del Gobierno de Puerto Rico, luego de descontados y reembolsados de gastos incurridos.

(e) Si la confiscación fuere impugnada judicialmente y el tribunal decretase la ilegalidad de la misma, el Secretario de Hacienda de Puerto Rico, previa presentación de copia certificada de la resolución o sentencia firme del tribunal, pagará a la persona que la impugnó el importe de la tasación o la suma obtenida en la venta en pública subasta en caso de que esta última sea la mayor, más intereses al 6% anual a partir de la fecha de la ocupación."

En revisión, este Tribunal revocó la decisión de anterior instancia en cuanto al carácter del arma ocupada y se dividió en cuanto a la legalidad de la confiscación. La opinión del

Juez que suscribe, con la cual estuvieron conformes los Jueces Asociados Señores Hernández Matos y Santana Becerra, declaró que: "La fuente original de esta institución de derecho [confiscación] es el principio consagrado por el Derecho común inglés, que la propiedad usada ilícitamente por el felón para cometer un delito no pasaba a poder de la Corona hasta tanto no hubiese una previa convicción del usuario—2 A.L.R.2d 740 sec. 2 (1949). Debido a este antecedente consuetudinario, en el Derecho norteamericano la llamada confiscación *in rem* siempre se hace en virtud de una declaración estatutaria expresa, aunque en ausencia de dicha declaración expresa, se trate de encontrar tal intención legislativa en el contexto general de la ley o en el alcance o limitación de los remedios establecidos en la misma."

Sigue: "Lo que distingue una confiscación *in rem* de una confiscación *in personam* es que la primera le niega al dueño de la propiedad, a su poseedor o encargado, o a cualquier persona con algún interés legal sobre la misma, todo derecho a reclamar dicha propiedad aunque pueda demostrar su inocencia ante el uso ilícito que se le haya dado a dicha propiedad. En la confiscación *in personam*, se les reconoce a las personas arriba enumeradas, el derecho a reclamar dicha propiedad, demostrando su inocencia en cuanto al uso ilícito, a menos que se trate de una cosa peligrosa *per se*, como es el caso de un arma mortífera o de una cosa declarada estorbo público por el propio estatuto como son los implementos utilizados para la falsificación de billetes o la impresión de loterías clandestinas. En cuanto a la incautación automática de una cosa peligrosa *per se*, véase *Downs* v. *Porrata, Fiscal*, 76 D.P.R. 611 (Belaval), cita precisa a las págs. 618–619."

Sigue: Examinada en su totalidad la Ley Núm. 39 de 1960, lo primero que advertimos es la falta de una declaración expresa en cuanto a la naturaleza *in rem* de la confiscación autorizada. Como toda ley civil relacionada indirectamente con la comisión de un delito, su ánimo correctivo parte

del supuesto de una persona culpable de su infracción. En cuanto a las personas inocentes, aunque no existe una excepción expresa en favor de ellas, se establece un procedimiento de naturaleza *in personam* en el cual: " 'Los dueños de la propiedad así ocupada, los que están a cargo de ella y los que tengan algún derecho o interés conocido en la misma, serán notificados de la ocupación y de la tasación . . . y podrán impugnar la confiscación . . . mediante demanda contra el Secretario de Justicia o el Secretario de Hacienda . . . y las cuestiones que se susciten deberán resolverse y los demás procedimientos tramitarse de la misma manera que si se tratase de una acción civil ordinaria' . . ."

La opinión del Juez Asociado Señor Blanco Lugo, con la cual estuvieron conformes los Jueces Asociados Señores Pérez Pimentel, Rigau, Dávila y Ramírez Bages, declaró que: "En *General Motors Acceptance* v. *Brañuela*, 61 D.P.R. 725, 729 (1943) adoptamos la regla al efecto de que 'el procedimiento de confiscación va dirigido contra el vehículo mismo y no contra sus dueños y que por consiguiente los derechos que sobre el vehículo puedan tener terceros inocentes no están protegidos, excepto en aquellos casos en que se demuestre que la posesión del vehículo ha sido obtenida por el infractor sin el consentimiento expreso o implícito del dueño o del tercero inocente, como sucede cuando el vehículo ha sido hurtado'. Añadimos que 'si el dueño o tercero interesado directa o indirectamente ha puesto el vehículo en posesión del infractor o de la persona bajo la cual actúa éste, los derechos del dueño o tercero interesado en tales circunstancias corren la suerte del uso a que el poseedor pueda someter el vehículo. . . .' La situación de las alegaciones en el caso de autos no justifica que se discuta la legalidad de la confiscación. En la demanda no se planteó la cuestión ya que el recurrente se limitó a alegar que 'en dicho vehículo no se cargaba, transportaba, llevaba o trasladaba un *blackjack* ni ninguna arma de las especificadas en la Ley 17 de 19 de enero de 1951, según ha sido

enmendada y por el contrario se alega que lo ocupado en el vehículo era una fusta, siendo la confiscación ilegal y arbitraria'. Este planteamiento fue rechazado por el tribunal de instancia y es precisamente porque hemos estimado que es procedente que estamos revocando la sentencia. Las determinaciones de hechos tampoco dan margen a sostener que se levantó la defensa de tercero inocente. Es más, si algo revelan es que al momento de ocuparse la fusta el vehículo era conducido por Anastasio Cintrón, 'y en él iba también Carlos M. Ortiz, el comprador condicional.' De lo expuesto surgiría presuntivamente un conocimiento del dueño del automóvil, y lo que es más decisivo, que el vehículo era conducido con su consentimiento. Conforme a la doctrina de los casos de *Brañuela*, *General Motors* y *Stuckert Motors Co.*, este conocimiento derrotaría cualquier alegación de tercero inocente que hubiese podido señalar el vendedor condicional."

Sigue para terminar: "Tampoco puedo concurrir en que la ausencia de una declaración expresa en cuanto a la naturaleza *in rem* de la confiscación en la Ley Uniforme de Confiscación de Vehículos, Bestias y Embarcaciones, Núm. 39 de 4 de junio de 1960, 34 L.P.R.A. secs. 1720 *et seq.*, tenga la importancia que se le pretende atribuir. Esta medida no es más que una ley de procedimiento. La autoridad para efectuar la confiscación sigue siendo las respectivas disposiciones de las Leyes de Armas, de Bolita, de Arbitrios, de Bebidas y de Drogas y Narcóticos, que en cuanto al carácter y extensión de los Secretarios de Hacienda y de Justicia, según sea el caso, no han variado sustancialmente desde que se resolvió el caso de *Brañuela*. Admito que la Ley Núm. 39 autoriza la impugnación de la confiscación por parte interesada, pero esto siempre ha sido así y nada nuevo ha añadido al estado del derecho local. . . ."

En cuanto al procedimiento *in rem* utilizado en la confiscación de objetos empleados en la comisión de un delito, la cuestión gira en torno a tres controversias que se producen

con bastante frecuencia en tal institución de derecho. Se trata de un complejo de disposiciones de Derecho internacional público, de Derecho constitucional, de Derecho penal, de estatutos procesales que tratan de prescribir derechos sustantivos, que versan todos sobre: (1) la naturaleza del procedimiento de confiscación; (2) la proscripción de los derechos de terceros inocentes sobre la cosa utilizada en la comisión del delito; (3) la admisibilidad de una prueba obtenida en contra de las prohibiciones constitucionales. Se trata de un complejo de disposiciones difíciles de aislar una de otras como proposiciones unilaterales pero fáciles de entender al considerarse conjuntamente desde una radical histórico-legislativa. Veamos:

(1) Posterior al caso de *General Motors Acceptance Corp.* v. *Brañuela*, (en reconsideración) que ya hemos acotado *in extenso*, se resolvió por este Tribunal el caso de *Martínez* v. *Buscaglia*, 69 D.P.R. 438 (1948), que al hablar sobre la naturaleza del procedimiento de confiscación, hace referencia al caso de *The Caledonian* 4 Wheat 99 (U.S. 1819) 4 L.Ed. 523. La decisión de este último caso es lo suficiente breve, y su contenido tan característico de la época que la produce, que bien vale la pena su total reproducción. Hela aquí:

"Este es el caso de una nave americana que salió de Charleston, Carolina del Sur, con un cargamento de arroz, con destino a Lisboa, alrededor del 28 de mayo, 1813, bajo la protección de una carta de navegación inglesa. En el curso de la travesía la nave fue capturada por una fragata inglesa, siendo enviada a Bermuda para su adjudicación. Se le celebró juicio y fue absuelta, y su cargamento, habiéndose prohibido su exportación, fue vendido más tarde en Bermuda por el agente del reclamante y el producto de la venta le fue remitido para su uso. La nave salió de Bermuda hacia Estados Unidos, en noviembre, 1813, y a su llegada a Newport, en Rhode Island, fue tomada por el colector de ese puerto y confiscada para los Estados Unidos. La acción contiene cuatro artículos presentando las causas de la confiscación; primero, por tener y usar la nave una carta de navegación

inglesa; segundo, por la nave comerciar con el enemigo; y tercero y cuarto, por usar una carta de navegación inglesa contrario a la ley del Congreso del 2 de agosto, 1813, cap. 56, prohibiendo el uso de cartas de navegación inglesas.

Es innecesario considerar los últimos dos fundamentos que se basan en prohibiciones estatutarias, porque es claro que los dos fundamentos precedentes, basados en la ley general de botín son suficientes para justificar su decomisación *juri belli,* estando claramente establecida la prueba de los hechos.

La única controversia envuelta en el caso es si la nave estaba sujeta a ser confiscada, después de su llegada a puerto, y si esto es así, si el colector tenía autoridad para hacer la confiscación. Somos claramente de opinión a favor de Estados Unidos en ambos puntos. No es necesario, para que el gobierno lleve a cabo la decomisación en este caso que el buque sea capturado en alta mar. *Por la ley general de guerra, todo barco amerciano navegando con carta del enemigo, o comerciando con el enemigo, es considerado como barco enemigo, y confiscado como botín.* Si es capturado en alta mar, por una embarcación del gobierno, la propiedad puede ser decomisada a favor de los captores como propiedad enemiga. Si es capturada por un barco particular, la captura aun es válida, y la propiedad debe ser decomisada a favor de Estados Unidos. Pero el derecho del gobierno a la confiscación no se funda en la captura; *surge de su autoridad general para tomar toda propiedad enemiga que llegue a nuestros puertos en tiempo de guerra;* y también de su autoridad para ejecutar una confiscación en contra de sus propios ciudadanos, siempre que la propiedad esté a su alcance. Si la mera llegada a puerto dejara sin efecto la confiscación, esto le proveería la máxima impunidad a personas que *llevan a cabo tráfico ilegal durante la guerra,* pues en la mayoría de los casos el gobierno no tiene medios de conocer la ofensa hasta que se verifica la llegada.

Respecto al otro punto, es regla general que cualquier persona puede tomar cualquier propiedad confiscada para uso del gobierno, bien por la ley municipal o por la ley del botín, con el propósito de hacer valer la confiscación. Depende del gobierno propiamente, si tomará acción en el asunto. Si adopta la actuación del particular, y procede a hacer valer la confiscación mediante procedimiento legal, esto es suficiente reconocimiento y

confirmación de la actuación del particular, y es de igual valor en ley que si a esa persona se le hubiese concedido originalmente autoridad para tomar la propiedad. La confiscación actúa retroactivamente, y es equivalente a un mandato." (Énfasis suplido.)

Como se ve, el precedente de *The Caledonian* se tomó de una práctica extra-territorial mal definida, tanto dentro del Derecho de gentes como dentro de los usos marítimos seculares, utilizada para entenderse con el enemigo en caso de guerra, y como tal, sin necesidad de justificar su sentido jurídico como norma aceptable a la vida pacífica de un pueblo, si tuviera que aplicarse a las infracciones de una Ley de rentas. De ahí trasladamos a nuestra disertación judicial el principio que si el gobierno procede a confiscar cualquier propiedad el solo hecho de la confiscación convalidaría tanto el registro como la ocupación, aunque éstos hubieran sido ilegales. Esto explica el rigor que han revestido las analogías al trasladarse a nuestras Leyes de rentas.

Si se examinan conjuntamente la primera disposición de tipo federal sobre la confiscación por haberse evadido los impuestos—Sec. 3450 de la Compilación de los Estatutos Revisados de Estados Unidos que dispone:

"Cuantas veces cualesquier bienes o mercancías, para los cuales o en relación con los cuales, alguna contribución ha sido o pueda ser impuesta sean movidos o depositados u ocultados en cualquier sitio con la intención de defraudar a los Estados Unidos de dicha contribución, o cualquier parte de ella, dichos bienes o mercancías . . . serán confiscados y en cada uno de dichos casos todos los barriles, barcos, cajas, o cualesquier otros paquetes de cualquier clase . . . respectivamente y todo barco, lancha, carreta y otros vehículos de cualquier clase y todos los caballos y otros animales y todas las cosas que se empleen en la locomoción o para el depósito u ocultación en cualquier sitio respectivamente, serán confiscados." y el Art. 62 de la Ley Núm. 6 de 30 de junio de 1936 de Puerto Rico que dispone: "El Tesorero queda por la

presente autorizado para confiscar cualquier vehículo, bote, lancha, o cualquier embarcación marítima o aérea que se capture cargado o en el momento de cargar o de estar transportando, llevando o trasladando espíritus destilados o bebidas alcohólicas fabricadas, importadas, destiladas o rectificadas ilegalmente y sobre los cuales no se hubieren pagado los impuestos prescritos por esta Ley; y los mismos serán vendidos en pública subasta para beneficio de El Pueblo de Puerto Rico; Disponiéndose que el Tesorero, a su discreción, y si el servicio público así lo requiere, podrá designar no más de cinco (5) de dichos vehículos o botes de motor para uso de los funcionarios y agentes debidamente autorizados por el Negociado de Bebidas Alcohólicas y Narcóticos" se descubre que no hay indicio legislativo sobre la naturaleza, alcance y efectos de la confiscación, fuera de la literal y simple significación de la palabra, ni tampoco descripción legislativa del procedimiento a seguirse, con excepción de la escueta referencia a la venta en pública subasta que contiene la Ley puertorriqueña.

Contrario a lo que se supone, el considerar la confiscación del objeto utilizado en un delito como un procedimiento *in rem* según lo tiene declarado nuestra jurisprudencia, no es una norma legislativa trasladada de una jurisdicción a otra, sino un pronunciamiento judicial de la Corte Suprema de Estados Unidos, aceptado originalmente por nuestro Tribunal como precedente obligatorio y después seguido como norma confiable dentro de las deferencias judiciales, llamado a chocar tal pronunciamiento, en el correr de los años, no sólo con el sistema de las prohibiciones constitucionales, sino con un nuevo concepto de la penalidad menos vindicativo.

Por el examen que hemos hecho de la jurisprudencia, tanto federal como puertorriqueña, se puede concluir que desde que se resuelve el caso de *Dobbins* hasta que se resuelve el caso *One 1958 Plymouth Sedan,* cualquier juez de Puerto Rico hubiese podido usar la regla de *Dobbins* o la regla de

*Boyd,* y de acuerdo con su particular preferencia penológica, declarar, el procedimiento de confiscación de los objetos utilizados en la comisión de un delito, como un procedimiento *in rem,* con todos los derechos de propiedad inocente embebidos, o como un procedimiento *in personam,* de carácter penal, con todos los derechos de propiedad inocente salvados hasta que se probara por el Estado, el conocimiento o la aceptación del hecho delictivo de los dueños o de los poseedores de derechos y gravámenes, que los convertiría en copartícipes del hecho delictivo, y entonces, la confiscación de los objetos utilizados en la comisión del delito formaría parte de la penalidad; sujeta siempre, como cualquier otra penalidad, a no rebasar el límite impuesto por la Constitución, tanto de Estados Unidos como de Puerto Rico, para evitar el castigo cruel e inusitado, según la noble advertencia del Juez Goldberg en el caso de *One 1958 Plymouth Sedan.*

Como se recordará, en cuanto a la confiscación de objetos o bienes utilizados en la comisión de un delito, aun en casos en que se aplicara la teoría del carácter *in rem* de las confiscaciones denegando la protección de los intereses inocentes como el caso de *Goldsmith,* el ilustrado Juez ponente McKenna dejó salvada para el porvenir la desproporción de la penalidad con el delito cometido: "Se dice que un vagón dormitorio puede ser confiscado si una botella de licor ilícito se ocupa sobre la persona de un pasajero y que un barco trasatlántico puede ser condenado a confiscación si un paquete de licor similar se recibe inocentemente y se transporta. Si tales posibilidades bajo esta sección estarían justificadas no estamos supuestos a considerarlas ahora."

En el caso de *One 1958 Plymouth Sedan,* la Corte Suprema de los Estados Unidos, aclara los casos de incautación automática de los objetos, cuya posesión por sí sola, constituye un delito, contestando a las objeciones del Estado de la siguiente manera: "El Estado además arguye que el pronunciamiento inequívoco del caso de *Boyd,* en el sentido,

que la Enmienda Cuarta se aplica a procedimientos de confiscación lo mismo que a procedimientos criminales, ha sido debilitado por las aseveraciones de la Corte Suprema de los Estados Unidos en los casos de *United States* v. *Jeffers,* 342 U.S. 48, 54, 96 L.Ed. 59, 65 y *Trupiano* v. *United States,* 334 U.S. 699, 710, 92 L.Ed. 1663, 1671. Contrario al caso de *Boyd,* los casos de *Jeffers* y *Trupiano,* no fueron procedimientos de confiscación, eran casos de procedimiento criminal federal. En ambos casos la Corte Suprema de Estados Unidos sostuvo que prueba obtenida en violación a la Enmienda Cuarta no era admisible sin que obstara que la prueba fuera de contrabando. Como acotación marginal (*dictum*), sin embargo, ya que el punto en controversia no estaba sometido a decisión, la Corte expuso en esos [dos] casos, que la regla que dicho contrabando debía ser excluído como prueba ilegalmente obtenida, no significaba que el Estado estaba obligado a devolver a Jeffers los narcóticos ilegalmente importados o el alcohol o mosto todavía sin registrar . . . . Tanto el caso de *Trupiano* como el de *Jeffers* se refieren a objetos cuya posesión, por sí misma, constituyen un delito . . . . La naturaleza de la propiedad aquí envuelta . . . es distinta. No hay nada, ni siquiera remotamente criminal, en poseer un automóvil. Es solamente el alegado uso al cual dicho automóvil se dedicó el que podría someter a Mr. McGonigle a la posible pérdida del automóvil. Y se concede que el Estado no puede establecer ningún uso ilegal sin mostrar la prueba obtenida por un registro, que se objeta por haberse hecho en forma contraria a lo que ordena la Constitución . . . ."

Se trata, pues, de la misma distinción que hicimos en nuestro caso de *Downs* v. *Porrata, Fiscal,* 76 D.P.R. 611 (1954), siguiendo la clásica inducción que diferenciaba lo *malum per se* de lo *malum prohibitum*: "La naturaleza *in rem* o *in personam* de un procedimiento depende en cuanto a su valoridad de lo que persiga el estatuto. Algunas veces una ley, como sucede con el art. 34 de la Ley de Armas de Puerto

Rico, según quedó enmendado por la Ley núm. 129 de 22 de abril de 1952 . . . declara como estorbo público ciertos instrumentos, que por su extrema peligrosidad para el Estado, tan pronto son ocupados, quedan ministerialmente confiscados, para su posible uso legal por el Estado o para su destrucción definitiva. Otras veces, como sucede con el art. 37 de la misma ley, según quedó enmendado por la Ley núm. 397 de 10 de mayo de 1951, se ordena una simple incautación de ciertos instrumentos, que a pesar de ser utilizables para fines lícitos, se convierten en instrumentos ilícitos por el uso que le ha dado el delincuente. En el primer caso, [arma] la confiscación es automática . . . sin tomar en consideración ningunos otros intereses que no sean los del estado mismo. En el segundo caso, la confiscación tiene que hacerse mediante declaración judicial, después que se pruebe (1) el uso ilegal de una cosa y (2) el conocimiento de los interesados de dicho uso ilegal . . . ."

En el comentario de Byron M. Unkauf del caso de *One 1958 Plymouth Sedan*, XL Tul. L. Rev. 673–674 y 677 (1965–66) dice el ilustrado comentarista: "Las confiscaciones estatutarias rara vez son favorecidas en los Estados Unidos, y, siendo usualmente consideradas como de naturaleza penal, se interpretan estrictamente en favor del reclamante . . . . Casi más importante que la regla de exclusión aplicada a acciones civiles de confiscación, fue la distinción hecha por la Corte en el caso anotado [*One 1958 Plymouth Sedan*] en relación con la naturaleza de los artículos de contrabando. Se había alegado que tanto en el caso de *United States* v. *Jeffers* como en el *Trupiano* v. *United States*, había una acotación marginal en el sentido de negar la necesidad de devolver la propiedad de un contrabando ilegalmente obtenida, a pesar de haberse suprimido como prueba en un proceso criminal. Rechazando el argumento, la Corte distinguió entre artículos que son peligrosos por sí mismos *malum in se* la mera posesión de los cuales constituye un delito y un contrabando que

deriva su ilegalidad de un uso ilegal. Devolver el primero no solamente dejaría sujeto al reclamante a un proceso criminal sino que frustraría el fin público que prohibe la posesión de dichos objetos; [por el contrario] la posesión de una propiedad como era el automóvil en el caso anotado no era *malum in se* [peligrosa por sí misma] y su devolución no frustraba ningún fin público. . . ."

2—Los derechos de terceros inocentes, sólo pueden ser constitucionalmente embebidos, cuando se trata de objetos criminosos que son peligrosos por sí mismos, tales como armas de fuego, billetes falsificados, narcóticos, alcoholes a medio procesar y aquellos instrumentos que sin ser peligrosos por sí mismos, se utilizan por sus dueños en un uso ilícito, siempre que la decomisación no resulte tan opresiva que pueda convertirse en una penalidad cruel e inusitada. Como se habrá entendido ya, la confiscación de todos los derechos propietarios sobre la cosa utilizada en la comisión de un delito, era el resultado del carácter *in rem* del procedimiento de confiscación, un absurdo que heredamos de las leyes sobre la piratería y los botines de guerra y de algunas exigencias procesales en cuanto a la notificación de partes desconocidas de la Ley de Almirantazgo.

El caso de *Dobbins* presentó la proscripción de los derechos inocentes con una gran simplicidad: "Hay casos, sin duda, en los cuales la sentencia de decomisación necesariamente lleva consigo, como una parte de la misma una convicción y sentencia contra la persona por el crimen cometido; y en esa situación de las alegaciones, es claro que el procedimiento es uno de naturaleza criminal [recuérdese que en el caso de *Dobbins* se trataba de una destilería y la finca sobre la cual estaba situada más la propiedad personal usada en conección con la misma] pero cuando la solicitud como en este caso, no envuelve la convicción personal del infractor por el delito cometido, el remedio de la decomisación es simplemente

de naturaleza civil, y la convicción del infractor debe obtenerse, si, acaso, en otro procedimiento totalmente independiente."

A esta aseveración del caso de *Dobbins* respondió el ilustrado Juez Bradley, en el caso de *Boyd*: "Si el Procurador del Estado elige renunciar a la acusación y radicar una acción civil contra los reclamantes, esto es, civil en su forma, ¿puede él en virtud de esta extorsión borrar del procedimiento su aspecto criminal y privar a los reclamantes de sus inmunidades como ciudadanos y obtener de ellos por la fuerza la presentación de sus documentos particulares, o en la alternativa, una confesión de culpabilidad? Esto no se puede hacer. La confiscación, aunque técnicamente es un procedimiento civil, es en substancia y efecto uno criminal . . . . Siendo, por lo tanto, las acciones por penalidades y confiscaciones, ocasionadas por la comisión de infracciones contra la ley, de una naturaleza cuasi-penal, entendemos que están comprendidas dentro de la clasificación de procedimientos criminales para todos los propósitos de la Enmienda Cuarta de la Constitución y de esa parte de la Enmienda Quinta que dispone que ninguna persona debe ser obligada en ningún caso criminal a ser un testigo en su contra . . . . Aunque el procedimiento usado en este caso esté despojado de muchas de las incidencias agravantes del actual registro y allanamiento, no deja, según se dijo antes, de contener sus esencias y persigue su mismo propósito cardinal. Puede decirse que es la misma cosa odiosa en su más leniente y menos repulsiva forma; pero las prácticas ilegítimas dentro de la constitucionalidad siempre dan su primer paso de esta manera, acercándose sigilosamente y desviándose cautelosamente de los modos rectos del procedimiento." Ya hemos visto como esta proscripción de los derechos inocentes hace crisis y desaparece de la jurisprudencia federal norteamericana. Veamos ahora lo que ocurre en la esfera legislativa.

En esta misma glosa hemos demostrado como la antigua Sec. 3450 de los Estatutos Revisados de los Estados Unidos, en el año 1939, se convierte en la Sec. 2807 y la Sec. 3321 (a) (b) del Código de Rentas Internas de los Estados Unidos, anteriormente a ese hecho legislativo, el 28 de octubre de 1919 se adopta la Ley Nacional de Prohibición, generalmente conocida como la Ley Volstead. Como se sabe, el Código de Rentas Internas federal, aprobado el 10 de febrero de 1939 —53 U.S. Stat. at L., cita precisa a las págs. 276 (drogas) 293 (armas de fuego) 310 (bebidas alcohólicas)—intentaba unificar en una sola pieza de legislación las disposiciones hasta entonces dispersas en viejos códices y leyes particulares sobre la confiscación de los objetos lícitos, convertidos en objetos ilícitos, por un uso ilegal. En cuanto a Puerto Rico todavía subsistía el Art. 62 de la Ley Núm. 6 de 20 de junio de 1936, que en cuanto a bebidas alcohólicas, autorizaba la confiscación de cualquier vehículo, bote, lancha, o cualquier embarcación marítima o aérea que se *capturara* en el momento de cargar o de estar transportando espíritus destilados o bebidas alcohólicas sobre los cuales no se hubieren pagado impuestos y por única descripción del procedimiento se ordenaba su venta en pública subasta para beneficio de El Pueblo de Puerto Rico; subsistía además el Art. 97 de la misma Ley Núm. 6, que copiada en su totalidad, disponía: "Siempre que el Tesorero de Puerto Rico esté facultado por esta Ley para vender artículos o productos confiscados por él o por sus agentes, la persona agraviada podrá apelar ante la correspondiente corte de distrito, y dicha corte tendrá jurisdicción después de ser oída la persona para confirmar, revocar o modificar la decisión del Tesorero. Dicha apelación deberá radicarse dentro de los diez (10) días siguientes a la fecha de la notificación de la persona interesada."

Cuando se resuelve el caso de *Stuckert Motors Company* v. *Tribunal de Distrito*, 74 D.P.R. 527, cita precisa a las págs. 530–533, el 7 de abril de 1953, un caso de confiscación

bajo la Ley de Armas, este Tribunal por voz de su Juez Presidente Snyder se expresó en estos términos: "El Tribunal sentenciador indicó que el artículo 37 es similar en su lenguaje al artículo 26 de la Ley Nacional de Prohibición . . . . No empece la similitud en lenguaje entre el artículo 26 de la Ley Nacional de Prohibición y el artículo 37 de nuestra Ley de Armas, no creemos que los casos resueltos bajo la primera controlan el asunto que pende ahora ante nos. En primer lugar, toda vez que la Ley de Prohibición presentaba muchos problemas peculiares, los casos resueltos bajo la misma frecuentemente no son de aplicación en otros campos. En segundo lugar, las cortes federales tenían constantemente ante sí durante la época de la prohibición el difícil problema de si el procedimiento para la confiscación de un vehículo caía bajo las leyes contributivas o bajo el artículo 26 de la Ley de Prohibición. Esto era importante ya que la primera no protegía, como lo hacía el art. 26, [de la Ley Nacional de Prohibición], los intereses de terceros o dueños inocentes [citas]. Por tanto el gobierno usualmente alegaba—a veces con éxito—que no se aprehendía a ninguna persona en el acto de transportar bebidas embriagantes en un vehículo con el fin de instar la acción bajo las leyes contributivas en vez de bajo la Ley de Prohibición en perjuicio de dueños o terceros inocentes. Pero aquí tenemos un estatuto estadual en donde no hay que hacer tal elección, en el campo distinto de poner en ejecución la Ley de Armas."

Por otro lado, cuando se resuelve el caso de *Downs* v. *Porrata, Fiscal*, 76 D.P.R. 611, cita precisa a las págs. 617–619 este Tribunal llama la atención hacia la diferencia que existe entre los objetos utilizados para la comisión de un crimen que por su extrema peligrosidad (*malum in se*) quedan ministerialmente confiscados y los que pueden ser utilizables para fines lícitos y el mal uso del malfechor (*malum prohibitum*) los convierte en objetos empleados en la comisión de un crimen.

En el 1960 se aprueba la Ley Núm. 39 de 4 de junio de 1960 de Puerto Rico, según enmendada por la Ley Núm. 10 de 1ro. de septiembre de 1961, conocida como Ley Uniforme de Confiscación de Vehículos, Bestias y Embarcaciones; se enmienda además el Art. 62 y el Art. 97 de la Ley Núm. 6 de 30 de junio de 1936.

Cuando se examina dicha Ley se da uno cuenta que del Código de Rentas Internas 1—de 10 de febrero de 1939 federal tomó el propósito de crear un sistema de procedimiento para todas las confiscaciones en cuanto a objetos lícitos convertidos en objetos ilícitos por un uso ilegal, tales como vehículos, bestias (animales de carga) y embarcaciones marítimas o aéreas. Véase 14 *Diario de Sesiones* (Ordinaria) Tomo 3, pág. 1300 (mayo 18 de 1961). En cuanto al procedimiento, no es difícil descubrir que nuestra Ley Núm. 39 de 4 de junio de 1960 es una versión bastante semejante a la Ley Volstead de 1919.

Si se examinan conjuntamente estas dos últimas leyes se ve que ambas contienen las siguientes características: (1) Se le da autoridad al oficial de mayor rango a cargo de aplicar la Ley, para ocupar los objetos ilícitos por algún uso ilegal (2) Se le permite a los dueños de la propiedad sustituir la propiedad confiscada por una fianza (3) Se le permite a los dueños, a los poseedores de gravámenes probar su desconocimiento del uso ilegal y su inocencia ante el hecho delictivo, (4) Se hace obligatoria la venta en pública subasta cuando no se reclame la propiedad por el dueño o los poseedores de gravámenes.

La profusa jurisprudencia sobre la Ley Volstead del 1919—27 U.S.C.A. § 40 (pág. 181-201)—demuestra que uno de los objetivos de esta sección era proteger los derechos de los dueños o poseedores o tenedores de gravámenes que resultaran inocentes en el uso ilegal o en la comisión del delito.

En cuanto a los objetos que son ilícitos por su naturaleza, "y que no sean vehículos, bestias o embarcaciones marítimas

o aéreas" sólo se concede una apelación ante el Tribunal Superior de Puerto Rico para probar cualesquiera circunstancia que conviertan a los objetos peligrosos por su propia naturaleza en objetos aprovechables.

3—Siempre unida a la violencia de la confiscación va, en la mayoría de los casos, la lesión de algún derecho de propiedad, de intimidad o de incriminación. La regla que cualquier propiedad lícita, convertida en ilícita por un uso ilegal, pero susceptible de ser aprovechable para fines lícitos, adquirida de una manera ilegal, en contravención a las garantías constitucionales, no puede legalizar una confiscación, es tan antigua como la propia institución del derecho de comiso. Es casi un dogma de Derecho constitucional, que propiedad ilegalmente adquirida, no puede recibirse por los tribunales para penalizar a un acusado. Como antes se ha explicado, la confiscación no es otra cosa que una penalidad adicional impuesta al infractor. Esa es la razón por la cual, en cada caso de confiscación, está envuelto el análisis de la prueba de la acusación a los efectos de determinar la legalidad de la misma. Si la prueba resulta ilegalmente adquirida, el acusado se declara inocente, y menos en los casos de objetos peligrosos *in se*, cuya mera posesión constituye delito, los instrumentos del delito deben ser devueltos al infractor.

Desde el caso de *Boyd* en 1886 hasta el caso de *Mapp* v. *Ohio*, en el 1961 dura el debate de la reforma. La creencia que la confiscación se daba sobre la cosa sin relación de clase alguna con la mala conducta personal o responsabilidad de su dueño en ese instante, según se dijo en el caso de *Dobbins* inició el debate. En el caso de *Boyd*, se rebatió no sólo la proposición de la naturaleza *in rem* del procedimiento sino también la necesidad de establecer la responsabilidad del dueño por el hecho delictivo antes de que se procediera a la confiscación del instrumento del delito, y que dicha responsabilidad tenía que establecerse mediante prueba que no hubiera sido ilegalmente obtenida mediante un allanamiento ile-

gal o una coacción autoincriminatoria. Estas fueron las palabras del Juez Bradley: "Existe una íntima relación entre las dos enmiendas. Cada una arroja una gran luz sobre la otra, ya que los registros y allanamientos irrazonables, prohibidos por la Enmienda Cuarta, son casi siempre hechos con el propósito de obligar a una persona a mostrar una prueba que lo incrimina, lo cual, en casos criminales se prohibe por la Enmienda Quinta; al declarar que una persona en un caso criminal no puede obligarse a servir de testigo contra sí mismo, por estar prohibido por la Enmienda Quinta, arroja luz sobre lo que puede ser un registro o allanamiento irrazonable dentro del significado de la Enmienda Cuarta. No hemos podido percatarnos que el registro de los libros particulares y documentos de una persona para utilizarlos como prueba contra él es algo sustancialmente distinto a obligarlo a servir de testigo en su contra."

El caso de *Weeks* siguió la misma línea de pensamiento del caso de *Boyd*: "La historia de la Enmienda Cuarta, según aparece de la opinión del Juez Bradley en el caso de *Boyd*, demuestra que la determinación de los Autores de las Enmiendas a la Constitución federal fue dotar a dicha carta Constitucional de una carta de inalienabilidad, procurando para el pueblo americano, entre otras cosas, aquellas garantías que se habían desarrollado en Inglaterra para proteger al pueblo contra registros y allanamientos irrazonables . . . . La máxima que 'la casa de un hombre es su castillo' fue hecha parte de nuestra Ley constitucional en las cláusulas prohibiendo registros y allanamientos y siempre se le ha considerado como de un alto valor para el ciudadano. Los esfuerzos desplegados por los tribunales y sus oficiales para traer al culpable cerca de su castigo no pueden ser ayudados por el sacrificio de aquellos grandes principios establecidos por años de empeños y sufrimientos incorporados hoy a la Ley fundamental de esta nación . . . . ."

En el caso de *Weeks*—una acusación por utilizar el correo para transportar ciertos cupones o boletos de una lotería— se trataba de un delito federal y se produce el nuevo "suplicio de pensamiento" entre federalistas e integralistas del cual ya hemos dado noticia. El caso de *Wolf* de 1948 se pronuncia en favor de los federalistas y la aplicación de las disposiciones estatales cuando se trate de delitos contra los distintos estados y el caso de *Mapp* v. *Ohio* se pronuncia en favor de los integralistas y ordena la aplicación de las Enmiendas Cuarta y Quinta cuando se trate de delitos federales en las cortes federales y a través de la Enmienda Catorce, la aplicación de las mismas Enmiendas Cuarta y Quinta cuando se trate de delitos estatales en las cortes estatales. La necesidad de esta admirable reunión de grandes razones de estado y discretos criterios de Ley fue explicada por el ilustrado Juez ponente Sr. Clark en las siguientes palabras: "No existe un estado de guerra entre nuestra Constitución y el sentido común. En la actualidad, un fiscal federal no puede hacer uso de una prueba ilegalmente obtenida, pero en la otra acera del frente, un fiscal estatal, puede hacer uso de dicha prueba ilegal, a pesar de estar supuesto a actuar bajo las prohibiciones en vigor de la misma enmienda. De esta manera, el Estado, admitiendo prueba ilegalmente obtenida, sirve para estimular la desobediencia a la Constitución federal que está supuesto a sostener. A pesar de que, según se dijo en el caso de *Elkins*, 364 U.S. 221, la verdadera esencia de un federalismo saludable depende en evitar cualquier conflicto entre las Cortes estatales y federales."

En el caso de *One Plymouth Sedan* se resuelve el debate en sus últimos extremos. Ya se ha logrado esa madurez en el juicio que permite la reforma. Siguiendo el criterio primero del Juez Bradley en el caso de *Boyd*, se declara: que cualquier procedimiento instituido con el objeto de decretar la confiscación de la propiedad de una persona (en el caso de autos, un automóvil) a causa de infracciones de ley cometidas

por ella, aunque se puedan considerar en su forma procedimientos civiles, en substancia son de naturaleza criminal; que la confiscación es sólo una penalidad más entre las impuestas para castigar un acto delictivo; se establece la distinción entre las confiscaciones de cosas peligrosas por sí misma, cuya posesión constituye delito y las cosas aprovechables que se convierten en ilícitas por un uso ilegal, siendo destruibles o dedicados a un uso público las primeras y reclamables para un uso privado lícito las segundas; que el Estado no puede establecer ningún uso ilegal con prueba ilegalmente obtenida, como sería el caso de un automóvil confiscado sin causa probable, legalmente establecida o del registro de un automóvil en forma contraria a la que ordena la Constitución; se rechazó el argumento "en cuanto a que el carácter técnico de la confiscación como un procedimiento *in rem* sobre la cosa tenga algún efecto sobre el derecho del dueño de la cosa para presentar como defensa cualesquiera violaciones de sus derechos constitucionales; que unidas las multas, las costas, los gastos de almacenaje al valor del automóvil confiscado, la penalidad puede estar fuera de proporción con el delito cometido, y de acuerdo con la Constitución, excesivo."

Por el estudio histórico-legislativo que hemos realizado se ve claramente la demolición del concepto del *procedimiento in rem* establecido por la anterior interpretación judicial; la demolición del mismo concepto establecido en los primeros estatutos federales y puertorriqueños; la demolición del principio del conocimiento tácito del uso ilegal por la simple entrega o autorización para usar la cosa; la demolición del concepto sobre el carácter civil de la confiscación en la cual solía refugiarse la jurisprudencia que autorizaba el uso de prueba ilegalmente obtenida para lograr dicha confiscación; el nuevo concepto de la confiscación como una penalidad.

De manera, pues, que cuantas veces se produzca la confiscación de un objeto aprovechable para un uso lícito, como resulta ser un automóvil, hay la obligación de respetar los

derechos inocentes de los dueños y poseedores de gravámenes sobre el objeto aprovechable, si no tienen conocimiento ni participación en el uso ilegal del automóvil por el infractor, pero es al Estado, al que corresponde la prueba de tal conocimiento o participación del dueño o del poseedor del gravamen en el uso ilegal antes de retener la propiedad como parte de la penalidad impuesta, si tal penalidad resultare razonable. Disiento.